ADDISON et al. v. HURON STEVEDOR-
ING CORP.

AARON et al. v. BAY BRIDGE OPERAT-
ING CO., Inc.

United States District Court
S. D. New York.

Dec. 14, 1950.

146

Max R. Simon, and Goldwater & Flynn, all of New York City (Monroe Goldwater, Max R. Simon, James L. Goldwater and Richard M. Goldwater, all of New York City, of counsel) for plaintiffs.

Cahill, Gordon, Zachary & Reindel, New York City, for Huron Stevedoring Corp.

Kirlin, Campbell, Hickox & Keating, New York City, for Bay Ridge Operating Co., Inc.

Fred J. Knauer, Kenneth D. Wallace, James H. Herbert and J. J. McDonnell, all of New York City, of counsel.

H. G. Morison, Asst. Atty. Gen., Irving H. Saypol, U. S. Atty., New York City (Edward H. Hickey, Special Asst. to the Atty. Gen. and Marvin C. Taylor, Special Atty. Department of Justice, Washington, D. C., of counsel), for other defendants.

Clark, Carr & Ellis, New York City (Paul A. Crouch, New York City, of counsel), amicus curiae for Various Contractors.

LEIBELL, District Judge.

The history of this litigation may be outlined as follows:

These two actions were brought under the Fair Labor Standards Act, § 16(b), 29 U.S.C.A. § 216(b), for wages due for "overtime", as that term was defined in § 7(a) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 207(a). Both actions were commenced by the filing of the complaints in this Court on October 4, 1945. They were consolidated for the purposes of trial by a stipulation and order of May 14, 1946. The claims of twenty plaintiff longshoremen (ten in each case), as typical of certain groups of claimants, were severed by stipulation June 17, 1946 and went to trial before Judge Rifkind on that date. He held for the defendants, the employing stevedores, 69 F.Supp. 956, except in certain comparatively minor items of the claims, page 961, relating to skill and cargo differentials, as to which additional proof was to be received and supplemental findings made. On appeal to the Court of Appeals, Second Circuit, the judgment for the defendants was reversed and the suits were remanded for the determination of the amounts due the plaintiffs in accordance with the opinion of the appellate court. 162 F.2d 665 at page 670. On a petition for a rehearing the appellate court stated, June 24, 1947, page 673:

"The petition for rehearing is denied. Our decision remanding the suits should be interpreted to permit the district court to consider any matters presented to it under the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq.[1] We do not, however, determine the scope or validity of any portions of that Act, since those matters have not been argued on these appeals."

The defendants petitioned the United States Supreme Court for a writ of certiorari, which was granted November 10, 1947, 332 U.S. 814, 68 S.Ct. 155, 92 L.Ed. 391, "On account of the importance of the method of computing the regular rate of pay in employment contracts providing for extra pay". 334 U.S. 446 at page 459, 68 S.Ct. 1186, at page 1194; 92 L.Ed. 1502. Mr. Justice Reed wrote the opinion for the majority of the Court. 334 U.S. 446, 68 S.Ct. 1186. It affirmed the judgment of the Circuit Court of Appeals with a modification, in that the order of the Circuit Court of Appeals allowing the District Court to consider any matters presented to it by petitioners as a defense in whole or in part under the Portal-to-Portal Act was broadened "so as to permit the District Court to allow any amendments to the complaint or answer or any further evidence that the District Court may consider just". 334 U.S. at page 477, 68 S.Ct. at page 1203.

The suits came on for a retrial on the remand on April 1, 1949 and on various dates thereafter, the last November 9, 1949. Meanwhile Public Law 177 of the Eighty-First Congress was approved by the President July 20, 1949; and on October 26, 1949

1. The Portal-to-Portal Act of 1947 was approved by the President May 14, 1947.

the Fair Labor Standards Act was amended by Public Law 393 which embodied in the Act itself the substance of Public Law 177, 29 U.S.C.A. § 201 et seq. The defendants' answers were amended and supplemented to include defenses under the Portal-to-Portal Act of 1947, and Public Laws 177 and 393 of the Eighty-First Congress. The period in suit before Judge Rifkind dated back to October 1, 1943, but the claims of the plaintiffs, by statement of their counsel, now cover only the period of October 15, 1943 to September 30, 1945.

\* \* \* \* \* \*

The collective bargaining agreement involved in these actions provided for a "straight time" rate of pay of $1.25 per hour for work performed on general cargo from 8 A.M. to 5:00 P.M., exclusive of 12 noon to 1 P.M. It also provided as "overtime", a rate of $1.87½ per hour, which was arithmetically the equivalent of time and a half the "straight time" rate.[2]

Section 7(a) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 207(a) provided:

"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The forty hour statutory workweek was in effect during the period involved in this litigation (October 15, 1943 to September 30, 1945).

The District Court held, 69 F.Supp. 956, that the "regular rate" defined in the stat-

ute did not necessarily mean average rate; that the contract "straight time" rate established by the collectively bargained agreement with the longshoremen's union was a "regular rate" within the statute; and that the contract "overtime" rate for general cargo (1½ times the contract straight-time rate), met the requirements of the statute as to overtime.

On appeal to the Circuit Court of Appeals, Second Circuit, 162 F.2d 665, that Court held that a "regular rate" could not be established by contract or by a collectively-bargained agreement which did not comply with the provisions of the Statute as to regular rates, and that where the employee worked at varying hours and varying rates the "regular rate" was determined by dividing the total wages actually paid to the employee in any one week by the total hours actually worked for his employer in that week. As an appendix to its opinion the Circuit Court of Appeals quoted certain of the District Court's Findings of Fact. [Findings Nos. 14 to 20 inclusive, 22, 25, 26, 30, 33 to 36 inclusive, and 41 to 46 inclusive]

On appeal to the Supreme Court of the United States, 334 U.S. 446, 68 S.Ct. 1186 it was held that the "regular rate" of pay is not established by an arbitrary label chosen by the parties but, as the Circuit Court of Appeals had held, was a fact to be determined from the evidence in accordance with the provisions of the statute. The Supreme Court held that as a general rule the "regular rate" of pay was determined by dividing the weekly compensation by the hours worked.

The Supreme Court expressed the view that the compensation which had been paid as contract "overtime" to these plaintiffs was not the type of overtime required by the statute; that the contract overtime was in effect a shift or work differential and represented higher wages paid because of the nature of the work done or because of the time at which it was done. The following quotations from the Supreme Court's opinion states its holding in this respect:

2. This was the General Cargo rate. Differences in rates for handling special cargo (cargo differentials) are later discussed.

"Under the definition, a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work, is not an overtime premium. It is immaterial in determining the character of the extra pay that an employee has actually worked at a lower rate earlier in the workweek prior to the receipt of the higher rate. The higher rate must be paid because of the hours previously worked, for the extra pay to be an overtime premium." 334 U.S. at page 466, 68 S.Ct. at page 1197.

"Where an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such wage represents a shift differential or higher wages because of the character of work done or the time at which he is required to labor rather than an overtime premium. Such payments enter into the determination of the regular rate of pay." 334 U.S. at page 468, 68 S.Ct. at page 1198.

"The statute commands that an employee receive time and one-half his regular rate of pay for statutory excess compensation. The contract here in question fails to give that compensation to an employee who works all or part of his time in the less desirable contract overtime hours." 334 U.S. at page 470, 68 S.Ct. at page 1200.

"As a matter of fact, regular working hours under a contract, even for an individual, has no significance in determining the rate of pay under the statute. It is not important whether pay is earned for work outside of regular working hours. The time when work is done does not control whether or not all or a part of the pay for that work is to be considered as a part of the regular pay.

"We think, therefore, that this case presents no problems that involve determination of the regular hours of work. As an employment contract for irregular hours the rule of dividing the weekly wage by the number of hours worked to find the regular rate of pay would apply." 334 U.S. as page 473, 68 S.Ct. at page 1201.

"Under the contract we are examining the respondents' work in overtime hours was performed without any relation as to whether they had or had not worked before.

Under our view of § 7(a)'s requirements their high pay was not because they had previously worked but because of the disagreeable hours they were called to labor or because the contracting parties wished to compress the regular working days into the straight time hours as much as possible." 334 U.S. at page 475, 68 S.Ct. at page 1202.

Two formulas were set out by the Court with respect to the credit the employer might take in the computation of the amount due the employee for the hours worked in excess of forty:

1. The credit may be equivalent to an amount computed by multiplying the number of hours worked in excess of forty by the "regular rate" of pay for the entire workweek, determined as aforesaid;

or

2. The credit may be equivalent to an amount computed by multiplying the number of hours worked in excess of forty by the "average rate" of pay for those hours in excess of forty.

The Supreme Court stated, however, that on the record before it the first method of computing the credit appeared to be the reasonable one; but it left to the District Court, on the remand, the determination of the method to be used from such evidence as might be produced on the retrial. In a footnote to this statement (No. 34) the Supreme Court pointed out mathematically the inequity of using the second method of computation in certain cases, but noted that the Wage and Hour Administrator in Press Releases No. 1913 and No. 1913(a) had provided for the use of the second method, where the employer had computed the "regular rate" on the number of hours worked in excess of forty. This same point had been discussed by the Circuit Court of Appeals, 162 F.2d 665 at pages 669–670 and rejected by it, for the reason that the evidence in these cases on the trial before Judge Rifkind did not indicate that the employer had so kept its records as to come within the language of the Administrator's ruling. The following is quoted from the Circuit Court's opinion, 162 F.2d at page 669: "The Administrator's Press Release 1913 stated that theretofore, where

an employee received more than one rate during a workweek, the Administrator had ruled that the employer must pay the employee an 'overtime rate of one and one-half his average hourly earnings for the entire week, computed by dividing the weekly earnings at both rates by the total number of hours worked in the week,' but that thereafter an employer would have an option, in the alternative, to compute the overtime rate at one and one-half times the rate at which the employee worked during the hours in excess of forty. However, this Release was later qualified by Press Release 1913A, which stated, 'In order to take advantage of this [revised] rule, the records of the employer must show which method of computing overtime compensation he had determined to follow.' Nothing in the evidence here indicates that either defendant so kept its records.'"

On the remand, it was still open to the employer to show from his records, if he could, that he had used the second method [that described in Press Releases Nos. 1913 and 1913(a)] to compute the "regular rate". But no evidence was offered on that point during the trial on the remand and the defendants fell back on the special defenses set forth in their answers as amended and supplemented.

On April 1, 1949 at a pre-trial hearing the defendants were relieved of the stipulation previously signed, which had conceded that the plaintiffs were engaged in interstate commerce. The defendants then stipulated, with respect to plaintiff's prima facie case, that plaintiffs were employed by defendants during the period covered by the suit, and that the cargoes handled by plaintiffs had been transported to the State of New York from other states or foreign countries, or were transported from the State of New York to other states or to foreign countries. For reasons hereinafter stated I have concluded that the plaintiffs were engaged in interstate commerce as defined by the Fair Labor Standards Act.

The defendants' answers as originally filed denied the material allegations of the complaint and set up three affirmative defenses: one, that plaintiffs were not covered by the Act; two, that the defendants complied with all the provisions of the Act; and three, that the New York State six-year statute of limitations applied with respect to all claims arising before that period. The statute of limitations was later fixed by the Portal-to-Portal Act of 1947 at two years for claims under the Fair Labor Standards Act and the third defense is no longer urged. The first defense, if it related to the exemptions under § 13 of the Act, has no application in view of the evidence. The second defense appears to be unnecessary in view of the denials in the answer.

At the pre-trial hearing, after the remand, the defendants moved for leave to amend their answers by adding thereto certain affirmative defenses numbered fourth to eleventh. These additional defenses were: *fourth,* that a substantial amount of the cargo handled by defendants was in the possession of the ultimate consumer and was being shipped by and to the ultimate consumer, and such goods were not in commerce; *fifth,* that much of the cargo was owned by the United States or some sovereign power and was shipped by the United States or the sovereign power as an administrative or sovereign act, and not as a commercial transaction; *sixth,* that much of the cargo handled, owned and shipped by the sovereign power, was used in connection with the prosecution of a war. The seventh affirmative defense was withdrawn and need not be considered.

The *eighth* affirmative defense is based upon an allegation that overtime premiums, such as were defined by the Supreme Court in this case and held to be a credit against overtime liability, were paid to plaintiffs. A ninth affirmative defense, similar to the eighth, was disallowed as repetitious.

The tenth and eleventh affirmative defenses are based upon Sections 9 and 11, respectively, of the Portal-to-Portal Act of 1947. 29 U.S.C.A. §§ 258, 260. The *tenth* defense alleges that the defendants in paying the plaintiffs, did so in good faith in conformity with and in reliance on certain administrative regulations, orders, rulings, approvals, or interpretations of an

agency of the United States and administrative practices and enforcement policies of the agency. This defense, if established against any claim, is a complete bar under the express language of § 9 of the Portal-to-Portal Act. The *eleventh* defense, based on § 11 of the Portal-to-Portal Act, alleges that the defendants acted in good faith and that they had reasonable grounds for believing that by paying plaintiffs in the manner they did they were not violating the Fair Labor Standards Act. On such a showing the Court may refuse to allow liquidated damages on any claim not completely barred by Section 9 of the Portal-to-Portal Act.

The case went to trial, after the remand, with the answers supplemented and amended as hereinabove summarized. Subsequently, on October 4, 1949, a further supplemental and amended answer was filed which pleaded as an additional affirmative defense Public Law No. 177, approved July 20, 1949, which contained provisions for crediting the employer, retroactively, with "overtime" pay paid pursuant to a collective bargaining agreement, and for ex-cluding such "overtime" in determining the "regular rate" of pay under the Fair Labor Standards Act. On November 9, 1949 the Court, at the request of the plaintiffs, received evidence which plaintiffs contended would show the unconstitutionality of Public Law 177. Briefs with proposed Findings were submitted in March 1950 and were thereafter supplemented by letters and memoranda.

In the trial on the remand before me I have considered the relevant portions of the record of the trial before Judge Rifkind. I have made Findings of Fact and Conclusions of Law which are being filed herewith. They include some of the Findings of Fact made by Judge Rifkind which have been adopted in full or with modifications.[3] The additional evidence adduced before me concerned the issues presented by the special defenses. I shall now consider the special defenses pleaded in the defendants' answers as amended and supplemented.

### THE "COMMERCE DEFENSE".

For their fourth, fifth and sixth affirmative defenses[4] the defendants plead

---

**3.** At the pre-trial conference in this case the Court stated:—"I think perhaps one solution of the matter might be to start with the record as made, and then the Court, after receiving briefs of counsel, will disregard such parts of the record as the opinion of the United States Supreme Court may indicate are not relevant or material to a determination of the issues in the case * * *

"Two Appellate Courts have passed upon the record, as made before Judge Rifkind. If they are to be called upon to review whatever my decision may be in the case, it will simplify their work if they have before them as a. record the record made before Judge Rifkind, their opinions in relation thereto, and then the additional record made before me and my decision on the entire case."

The numbers of the Findings of Fact in the first column (R) are those as found by Judge Rifkind. Those listed in the second column are corresponding findings made by me. (L)

**4.** "For A *Fourth* Separate And Distinct Defense To Parts Or All Of The Causes Of Action Of Some Or All Of The Plaintiffs

"7. At all times mentioned in the complaint much of the cargo handled by the defendants and the plaintiffs at the Port of New York was owned by and in the actual physical possession of the ultimate consumer thereof other than the producer, manufacturer or processor thereof and was being shipped by and to the said ultimate consumer. By reason thereof the said cargo was not goods in commerce within the meaning of the Fair Labor Standards Act, and the plaintiffs handling such cargo were not engaged in commerce or the production of goods for commerce within the meaning of those words as used in the Fair Labor Standards Act."

"For A *Fifth* Separate And Distinct Defense To Parts Or All Of The Causes Of Action Of Some Or All Of The Plaintiffs

"8. At all times mentioned in the complaint much of the cargo handled by the defendants and the plaintiffs at the Port of New York was owned by the Government of the United States or other sovereign powers, and was shipped by the sovereign power to itself or to other sovereign powers, for use only in discharge-

that the plaintiffs were not engaged in "commerce" or the "production of goods for commerce", as those words are defined in Section 3 of the Fair Labor Standards Act, because in many instances the cargo handled by defendants was owned and in the physical possession of the ultimate consumer, was not in commerce, and was being shipped by and to the ultimate consumer; because the cargo was owned by the United States or some other sovereign power and was being shipped by the United States or another sovereign power as an administrative act of the sovereign and not as a commercial transaction; and because the cargo was shipped by such sovereign powers in the prosecution of a war in which they were engaged as combatants.

A large part of the evidence presented by the defendants in support of these defenses related to the activities of the stevedoring companies under their Warshipsteve contracts with the War Shipping Administration; the nature of the cargoes handled by the plantiffs, and their use in the prosecution of the war; the authority of the governmental agencies which were consignors and consignees of the cargo; and the extent of the control exercised by the War Shipping Administration over the defendant stevedoring companies. The facts found in relation to those contentions are set out in Findings of Fact Nos. 210 to 245 inclusive.

Prior to May 8, 1950 there was a conflict of judicial opinion among the United States Circuit Courts of Appeals on the question of whether the employees of contractors, who were engaged by the United States on a cost plus fixed fee basis to produce and handle munitions and other war goods, were employees engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act. Reed v. Murphey, 5 Cir., 1948, 168 F.2d 257, remanded 1948, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410; Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016, remanded, 1948, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347; Divins v. Hazeltine Electronics Corp., 2 Cir., 1947, 163 F.2d 100; Bell v. Porter, 7 Cir., 1947, 159 F.2d 117, certiorari denied 330 U.S. 813, 67 S.Ct. 1092, 91 L.Ed. 1267. See also Barksdale v. Ford, Bacon & Davis, Inc., D. C.E.D.Ark.1947, 70 F.Supp. 690; Lasater v. Hercules Powder Co., D.C.E.D.Tenn.1947, 73 F.Supp. 264, affirmed 6 Cir., 171 F.2d 263; McLaughlin v. Todd & Brown, Inc.,* N.D.Ill.1948.

On May 8, 1950 the Supreme Court decided three cases, Powell v. U. S. Cartridge Co. (Aaron v. Ford, Bacon & Davis, Creel v. Lone Star Defense Corp.), 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017, in all of which the Circuit Courts of Appeals had held that the Fair Labor Standards Act did not apply to persons employed at a Government owned munitions plant, which was operated for the United States by a private contractor on a cost plus fixed-fee basis. The facts in each case were substantially the same. As stated by the Supreme Court in the Powell case, 339 U.S. at page 499, 70 S.Ct. at page 757, the contract between the Government and the contractor provided: "* * * that the respondent would operate the Government's plant for the manufacture of certain types and quantities of small arms ammunition, that the Government would reimburse the respondent for its expenditures in such operation and, in addi-

of sovereign functions. Such shipments were therefore the administrative acts of the United States Government or other sovereign powers and were not such commercial transactions as would render the plaintiffs' activities in connection therewith subject to the provisions of the Fair Labor Standards Act."

"For A *Sixth* Separate And Distinct Defense To Parts Or All Of The Causes Of Action Of Some Or All Of The Plaintiffs

"9. At all times mentioned in the complaint, much of the cargo handled by the defendants and the plaintiffs at the Port of New York was owned by the Government of the United States or other sovereign powers and was shipped by such sovereign powers for use in connection with the prosecution of the war. Such shipments therefore were not such commercial transactions as would render the plaintiffs' activities in connection therewith subject to the provisions of the Fair Labor Standards Act."

1. No opinion for publication.

tion, pay the respondent a fixed fee based upon the types and quantities of ammunition it supplied. The title to the site, plant, equipment and, in general, to the raw material, work in progress and finished munitions was to be in the Government. Most of the materials were to be supplied by the Government. The contract provided expressly for the reimbursement of the respondent's expenses for labor. The respondent, in turn, agreed to supply practically all services incident to the setting up of an efficient operating force and to the operation of the plant until the required ammunition had been produced. The respondent was made responsible for storing the materials, supplies and finished ammunition and for loading the ammunition on cars or other carriers in accordance with the Government's instructions. The ammunition generally was shipped by common carrier on Governent bills of lading to military destinations outside of Missouri. The Government reserved large rights of supervision, auditing and inspection to be exercised through its 'Contracting Officer.' The employees, including the petitioners, were to be hired, assigned, directed, supervised, paid and discharged by the respondent. The contract stated expressly that all persons engaged in the work 'shall be subject to the control and constitute employees of the Contractor * * *.' It quoted all of the 'representations and stipulations' relating to employment directed by the Walsh-Healey Act. Under it the contracting officer (subject to a right of appeal) could require the respondent to dismiss any employee whom he deemed incompetent or whose retention 'is deemed' not to be in the public interest. The contract made no express reference to the Fair Labor Standards Act. However, in a booklet which was distributed by the respondent, each employee at the St. Louis Ordnance Plant was informed, among other things, that 'There will be eight hours in any working day, and forty hours will constitute a working week. * * * When production demands require a longer work day, or longer work week, the Company will pay the legal overtime rate as provided under the Walsh-Healey Act, and the Fair Labor Standards Act.' "

The Supreme Court held that the defendant was an independent contractor operating the plant for the Government; that the employees were not employees of the Government; that they were engaged in the production of goods for commerce; that the transportation of munitions of the United States to destinations outside of the state of their production is "commerce" within the meaning of the Fair Labor Standards Act, even though they were for use or consumption by the United States; and that munitions were "goods" within the meaning of the Fair Labor Standards Act.

In the cases at bar the Government did not have title to the property of the stevedores; it had not been requisitioned. And by the terms of the Warshipsteve agreements the longshoremen were employees of the defendant stevedores and the stevedores in turn were independent contractors. Th cargoes described in Findings of Fact Nos. 228, 229, 243–245 were in some respects less characteristic of the term "war materials" than the munitions involved in the Powell case. For the most part they were lend-lease supplies. But shipments of munitions were also handled by plaintiff longshoremen. The facts in the Powell case indicate that the supervision exercised by the Government over the work of the contractor, the manufacturer of munitions, was greater than that exercised by War Shipping Administration over the defendant stevedores in the instant cases. In my opinion, the Powell case is clearly decisive of the issues raised by the defendants in their Fifth and Sixth defenses and requires a dismissal of those defenses.

With respect to the Fourth defense, that the goods were not goods in commerce because they were in the actual physical possession of the ultimate consumer (the United States) when the stevedoring services were rendered, the applicability of the Powell case seems equally clear. In the majority opinion it was stated: "A. *The 'transportation' of munitions of the United States to destinations outside of the state of their production is 'commerce' within the meaning of the Act.* The Act applies to 'employees * * * engaged in commerce

or in the production of goods for commerce.' The precise question here is whether the munitions were produced for 'commerce' when such production was for transportation outside of the state and for use by the United States in the prosecution of war, but not for sale or exchange."

And also: "We believe that the crucial fact which establishes the coverage of the Act is the status of the munitions, as 'goods,' during the time they were being produced. The literal meaning of the exclusionary clause in § 3(i), and that which best serves the purposes of the Act, is merely that, after the products shall have been delivered into the actual physical possession of their ultimate consumer, they then shall cease to be 'goods.' This retains the important effect that, thereafter, it is not a violation of § 15(a) (1) for the ultimate consumer to transport the products outside of the state. This interpretation was adopted by the Wage and Hour Administrator. 1940 WH Man. 131, 133. It was readopted without change in the July, 1947, revision of the Administrator's Interpretations. 12 Fed.Reg. 4585, 29 C.F.R. § 776.7(h).[16]"

The footnote (16) states in part: " 'The fact that products lose their character as "goods" when they come into the actual physical possession of the ultimate consumer does not affect the coverage of the act as far as the employees producing the products are concerned. * * * All that the term "goods" quoted above is intended to accomplish is to protect ultimate consumers, other than producers, manufacturers, or processors of the goods in question from the "hot goods" provision of section 15(a) (1). This seems clear from the language of the statute. * * *' "

▮ The longshoremen in the cases at bar had nothing to do with the production of the goods. They did not work for the contractor who produced the goods and they were not employees of the ultimate consumer. For an employee to be deemed "engaged in commerce", as distinct from the "production of goods for commerce," his activities must be "actually in or so closely related to the movement of the commerce as to be a part of it." McLeod v. Threlkeld, 319 U.S. 491 at page 497, 63 S.Ct. 1248, at page 1251, 87 L.Ed. 1538. The longshoremen were employed by the stevedore in assisting in the transportation of the goods, and they were "engaged in commerce" within the meaning of the Fair Labor Standards Act. Joseph v. Carter & Weekes Co., 330 U.S. 422 at page 426, 67 S.Ct. 815, 91 L.Ed. 993.

Section 3(b) of the Fair Labor Standards Act of 1938 defined commerce as follows: " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

The defendants also argue that Congress never intended that *incoming foreign shipments* were to be covered by Section 3(b) of the Fair Labor Standards Act as enacted in 1938, which provided that commerce was "transportation * * * from any State to any place outside thereof." Section 3(b) of the Act, as revised by Public Law 393 and as effective January 25, 1950 provides that commerce is "transportation * * * between any State and any place outside thereof". The section in its revised form covers the handling of incoming cargoes from foreign ports.[5] Prior to the amendment, the Wage and Hour Administrator had held [6] that the exclusion of incoming cargoes from coverage was valid only when the imported goods were consumed within the state of importation, and that the exemption did not apply to goods which were destined to be transported and were subsequently transported across state lines after their arrival in a United States port. In most instances, the foreign cargoes handled by plaintiff longshoremen at the Port of New York were consigned to Governmental agencies and to persons outside the State of New York and subsequently transported to their destination. It would appear that the exclusionary clause of Section 3(i) of the Fair Labor Standards Act of 1938, affecting

5. See Conference Report on Public Law #393 at p. 2252, U.S.Code Congressional Serv. 1949, 81st Congress.

6. Wage & Hour Manual (1944-1945 Edition) p. 116.

goods imported prior to January 1950, should be limited to those goods consumed within the state of importation. On that issue—the place of consumption of imported goods not consigned by shipping document to places outside the State—there is no proof in the record in this case on which any determination could be made. How much is involved is not shown and at best it would be small. It would have no effect on the claim of a longshoreman unless in the course of a week the cargoes he handled were practically all imported cargoes, intended for consumption within this State. The record indicates that any such engagement that was not in interstate commerce would be only occasional and spasmodic, not enough to affect the employees substantial engagement in commerce. Skidmore v. John J. Casale, Inc., 2 Cir., 160 F.2d 527 at page 530, certiorari denied 331 U.S. 812, 67 S.Ct. 1205, 91 L.Ed. 1832.

The defendant, Bay Ridge, did the stevedoring work for Furness, Withy Co. Ltd. and was owned and controlled by that company. Almost all the ships involved used the shore installations of Furness, Withy & Co. at the Port of New York.[6a] Furness, Withy Co. operated vessels for the British government and the outgoing cargoes were nearly all destined for use by some agency or department of the British government.

It cannot be reasonably claimed that the British government and its agencies, and the cargoes handled by Bay Ridge for its account, are in any different position as to the application of the Fair Labor Standards Act to the work of the longshoremen employed by Bay Ridge, than are the United States Government, its agencies and cargoes, and the longshoremen employed by Huron. Further, much of the space aboard the British vessels was used by the War Shipping Administration and United States agencies for lend-lease goods consigned to British or American agencies; and Bay Ridge rendered some stevedoring services to American ships for the War Shipping Administration or American steamship companies. After the Fall of 1942 practically all American ships had been requisitioned by the United States government. The Supreme Court's decision in the Powell case would apply to the longshoremen employed by both defendants.

The defendants' Fourth defense is dismissed for the reasons hereinabove stated.

### The defense based on Section 9 of the Portal-to-Portal Act of 1947

The defendants' *tenth* affirmative defense[7] pleads, as a complete bar to plaintiffs' claims, Section 9 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258, which

---

6a. At New Haven, Connecticut, some ships were loaded with lumber by employees of Bay Ridge.

7. "For A *Tenth* Separate And Distinct Defense To The Causes Of Action Of All Plaintiffs

13. The defendant says that section 9 of the Portal-to-Portal Act of 1947 provides that, 'no employer shall be subject to any liability * * * for or on account of the failure of the employer to pay * * * overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged * * *'

The defendant says that in paying the plaintiffs as it did (the act or omission of not paying them otherwise being the basis of the present actions) the defendant was acting in good faith in conformity with and in reliance upon administrative regulations, orders, rulings, approvals, or interpretations of agencies of the United States, or administrative practices or enforcement policies of agencies of the United States with respect to the class of employers to which the defendant belongs, within the meaning of those words as used in said section 9, such as United States Maritime Commission, War Shipping Administration, the Army, the Navy, United States Department of Labor, the Wage and Hour Division, the War Labor Board, the Wage Stabilization agencies, and the United States Department of Justice, and therefore the plaintiffs are barred from recovery by the provisions of said section."

provides that an employer shall not be liable for failure to pay overtime compensation under the Fair Labor Standards Act of 1938, as amended: "if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect."

■ Under this provision of the statute there are six elements which the employer has the burden of proving: That he acted (1) in good faith (2) in conformity with and (3) in reliance on (4) an administrative regulation, order, ruling, approval, interpretation, or administrative practice or enforcement policy of (5) any agency of the United States, (6) with respect to the class of employers to which he belonged. See Ferrer v. Waterman S. S. Co., D.C. Puerto Rico 1949, 84 F.Supp. 680; Burke v. Mesta Mach. Co., D.C.W.D. Pa. 1948, 79 F.Supp. 588; Jackson v. Northwest Airlines, D.C.Minn. 1948, 76 F.Supp. 121, reversed 8 Cir., 185 F.2d 74, where the courts have set forth the requirements in four categories.[8]

Numerous cases have considered the provisions of Section 9 in varying factual situations, and some of the principles applied in the various cases are not reconcilable in all respects. Darr v. Mutual Life Ins. Co., 2 Cir., 1948, 169 F.2d 262, certiorari denied 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415;

Rogers Cartage Co. v. Reynolds, 6 Cir., 1948, 166 F.2d 317, 3 A.L.R.2d 1090; Wells v. Radio Corp. of America, D.C.S.D.N.Y. 1948, 77 F.Supp. 964; Moss v. Hawaiian Dredging Co., D.C.N.D. Cal., 83 F.Supp. 528; Kam Koon Wan v. E. E. Black, Ltd., D.C. Hawaii 1948, 75 F.Supp. 553; Brueschke v. Joshua Hendy Corp., D.C.Calif. 1947; Kenney v. Wigton-Abbott Corp., D. C.N.J.1948, 80 F.Supp. 489; Blessing v. Hawaiian Dredging Co., 76 F.Supp. 556 and French v. McWilliams Dredging Co., N.Y.Sup. 1948, 195 Misc. 90, 88 N.Y.S.2d 838, reversing 191 Misc. 1022, 78 N.Y.S.2d 317 are all cases holding Section 9 to be a good defense, with fact situations similar in some respects to those in the instant case. On the other hand Reid v. Day & Zimmerman, D.C.S.D.Iowa, 1947, 73 F.Supp. 892, affirmed 8 Cir., 1948, 168 F.2d 356; Burke v. Mesta Mach. Co., D.C.W.D.Pa.1948, 79 F.Supp. 588; Bauler v. Pressed Steel Car Co., D.C.N.D.Ill.1948, 81 F.Supp. 172, affirmed 7 Cir., 182 F.2d 357; Hoffman v. Todd & Brown, Inc.,* D.C.Ind.1948; Glowienke v. Hawaiian Dredging Co., D.C.Ill. 1948, 84 F.Supp. 678; Jackson v. Northwest Airlines,[9] D.C.Minn.1948, 76 F.Supp. 121; Ferrer v. Waterman Steamship Corp., D.C. Puerto Rico 1949, 84 F.Supp. 680; and Knudsen v. Lee & Simmons, Inc., D.C.S.D. N.Y.1949, 89 F.Supp. 400 are all cases in which a Section 9 defense was rejected by the Court, and those cases contain one or some of the factual situations on which the defendants' counsel base their arguments in the instant case.

■ But it is apparent from all of these cases that the *good faith* exercised by the employer must be of such a character that it can meet an objective test:— was his course of conduct innocently followed with an honest intention and was it pursued in the same manner as a reasonably prudent man would have acted under the same circumstances.

8. An issue in the instant case raises the question of what constitutes "any agency" within the meaning of Section 9 and it seems desirable to set that portion of the statute up as a separate element to be proved. The ruling etc. must, of course, relate to the class of employers

to which the defendant employer belongs, in this case the stevedores.

I. No opinion for publication.

9. Reversed November 6, 1950 by the Eighth Circuit Court of Appeals, 185 F.2d 74.

The employer's conduct must also have been in *conformity with* an administrative rule or interpretation or policy of a governmental agency; i.e., it must be in accordance with the agency ruling or interpretation and must follow the agency's established policy. Further, the administrative ruling or interpretation or policy must actually have been *relied on* by the employer; i.e., he must have had knowledge of it and acted on it, so that it can be said to have influenced his conduct.

In the cases cited above different *types of agency action* were considered by the courts in determining what constitutes the fourth requirement of Section 9, "any administrative regulation, order, ruling, approval, or interpretation". It is well settled the mere inspections of payrolls by field investigators of the Wage and Hour Division followed by a failure on their part or on the part of the Division to complain of the employer's practice is not sufficient to constitute a ruling or interpretation.[10] However, an actual non-enforcement policy by the Wage and Hour Administrator;[11] an approval of a contract or pay schedules or a directive in relation thereto, by the National War Labor Board, the Salary Stabilization Unit of the Treasury Department, having knowledge of the facts;[12] a circular letter issued by the Chief of a Bureau of the Navy;[13] an opinion letter by the Regional Attorney for the Wage and Hour Division;[14]—each of these has been held to be a ruling or interpretation of an agency of the United States within the meaning of Section 9.

The plaintiffs seem to contend that the reliance mentioned in the statute must be on the ruling etc. of the administrative agency specifically charged with the administration of the Wage and Hour law, as distinguished from any contracting agency of the government. The broad language of Section 9 does not lend itself to such a narrow construction. Section 9 uses the words—"any agency of the United States". Sections 9 and 10 of the Portal-to-Portal Act of 1947 clearly differentiate between rulings, interpretations, etc. made prior to May 14, 1947 and those subsequent thereto. The rulings, interpretations etc. made prior to May 14, 1947, on which the employer may claim to have relied, may be those of "any agency of the United States" § 9; but after May 14, 1947 the agency must be the Wage and Hour Division of the Department of Labor, and no other. § 10(b) of the Portal-to-Portal Act of 1947.

The decisions of the courts have noted this distinction and have not limited § 9 of the Portal-to-Portal Act of 1947 to the rulings, interpretations etc. of the Wage and Hour Division. In Kenney v. Wigton-Abbott Corporation, D.C.N.J.1948, 80 F.Supp. 489, 496 the Court held: "The Portal-to-Portal Act itself does not define the term agency as used in Section 9. It speaks of an 'agency of the United States'. The Wage and Hour Act Administrator in an Interpretative Bulletin, (with which this court, in the circumstances of the instant suit, finds itself in accord), Title 29 Code of Federal Regulations, Chapter V, part 790, section 790.13, 29 C.F.R., 1947 Supp. § 790.13, page 4417, states: 'But where the acts or omissions complained of occurred before May 14, 1947, the employer may show that they were in good faith in conformity with and in reliance on "any" (written or non-written) Administrative regulation, order, ruling, or interpretation of "any agency of the United States" * * *'.

10. Burke v. Mesta Mach. Co., D.C., 79 F.Supp. 588; Bauler v. Pressed Steel Co., D.C., 81 F.Supp. 172; Wells v. Radio Corp. of America, D.C., 77 F. Supp. 964; Anderson v. Arvey, Corp., D.C., 84 F.Supp. 55.

11. Darr v. Mutual Life Ins. Co., 2 Cir., 169 F.2d 262, certiorari denied 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415.

12. Wells v. Radio Corp. of A., D.C., 77 F.Supp. 964; Rogers Cartage Co. v. Reynolds, 166 F.2d 317, 3 A.L.R.2d 1090; Brueschke v. Joshua Hendy Corp., supra.

13. Kenney v. Wigton-Abbott Corp., D.C., 80 F.Supp. 489; Blessing v. Hawaiian Dredging Co., 76 F.Supp. 556.

14. Burke v. Mesta Mach. Co., 79 F. Supp. 588, 607; Moss v. Hawaiian Dredging Co., D.C., 83 F.Supp. 528.

"See also: 29 C.F.R.1947 Supp., § 790.19, page 4425.

"The term 'Agency' as used in other Federal statutes has generally had a broad meaning. In the Administrative Procedure Act, § 2(a), 5 U.S.C.A. § 1001(a), the term has been defined as follows: ' "Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia.'

"In the Federal Register Act, § 4, 44 U. S.C.A. § 304, the term has been defined as meaning ' * * * the President of the United States, or any executive department, independent board, establishment, bureau, agency, institution, commission, or separate office of the administrative branch of the Government of the United States but not the legislative or judicial branches * * *'.

"In view of the broad definitions customarily used in other statutes and the lack of any limiting terms in this Act, the court concludes that the term 'any agency' is sufficiently broad to include within it the Bureau of Yards and Docks."

Such agencies as the Bureau of Yards and Docks of the Navy Department, Kenney v. Wigton-Abbott Corp., supra and Blessing v. Hawaiian Dredging Corp., supra; the National War Labor Board, Brueschke v. Joshua Hendy Corp., supra, and Rogers Cartage Co. v. Reynolds, supra; the War Department, French v. McWilliams Dredging Co., supra, and Kam Koon Wan v. E. E. Black, Ltd., D.C. Hawaii 1948, 75 F.Supp. 553; authorized deputies or counsel of the Wage and Hour Division, Reid v. Zimmerman, supra, Burke v. Mesta Mach. Co., D.C.W.D.Pa. 1948, 79 F.Supp. 588 and Moss v. Hawaiian Dredging Co., supra were all held to be "agencies of the United States" within the meaning of Section 9 of the Portal-to-Portal Act of 1947. In the Conference Report of the Joint House of Representatives and Senate Committee on the Portal-to-Portal Act, H.R. 2157 (H.R. 326, p. 16) the following appears: "It will thus be seen that the Administrative regulation, order, etc. does not have to be in writing, nor does it have to be a regulation, order, etc. of the Federal Agency which administers the Act in question. It will be sufficient if the employer can prove that his act or omission was in good faith in conformity with and in reliance on an administrative regulation, order, etc. of any Federal Agency."

An examination of the evidence in the instant cases, in the light of the requirements of Section 9, convinces me that the defendants have sustained the burden of proving their reliance in good faith on an administrative ruling, regulation, or order or interpretation of various agencies of the United States.

The plaintiffs contend, in effect, that the defendants are chargeable with all the knowledge of the officers of the New York Shipping Association as well as with whatever notice was received by the Association, in connection with the problem of overtime compensation under the Fair Labor Standards Act and the interpretation of the International Longshoremen's Association's collective bargaining agreement. This contention is based upon the assertion that the New York Shipping Association was the general agent of the membership for the purpose of handling their labor relations problems and that the application of Section 7 of the Fair Labor Standards Act to the collective bargaining agreement came within the scope of the Association's authority.

Findings of Fact Nos. 8, 10, 39 and 40 to 45 inclusive, set forth the facts as to the organization and objects of the New York Shipping Association. As set forth in Article II of the Articles of Association, the objects of the Association were the promotion of the mutual welfare of its members and their waterfront employees and the development of local operating matters. It was a practice of the officers of the association and its counsel to gather information relative to the interpretation of the collective bargaining agreement, the longshore pay practices, labor problems of the stevedoring industry and the inter-

158

pretation of labor laws applicable to long-shoremen. Reports or bulletins were sent to members to keep them informed. Specific inquiries from members were answered. But there was no duty or obligation imposed on the officers or counsel to inform the membership of everything that came to the knowledge of the officers and counsel on such matters. They exercised their discretion and reported on whatever they thought worth while. It is apparent from the reports submitted to the members that the Association's officers selected the information in its possession that was disseminated to the members. It cannot be presumed that all the information in its possession was transmitted to the members. We must look to the reports or bulletins to see what was transmitted.

The findings also describe the organization of a "conference committee" whose duty it was to conduct the negotiations for the collective bargaining agreements with the waterfront employees. It does not appear in the Articles of Association that the New York Shipping Association or its Conference Committee was authorized to bind the individual members in their business relations with others. In connection with the wage agreements, its authority was limited to that of negotiation of the terms thereof and a recommendation as to their approval.

Findings of Fact Nos. 48, 50–60, 86–89, 105–111, 151, 152, 156, 164, 166–168, 179, 181–188 and 191 describe the manner in which the Association and its officers fulfilled the functions and objects of the Association, their relationship and activities in connection with the members of the Association, and the representatives of the various government agencies and departments with which officers and counsel conferred.

The Association gathered information and disseminated it to its members by circulating reports or bulletins. The members acted independently upon such information as they received. The various members had their own attorneys. In negotiating the collective bargaining agreements, the assent of the association to the terms of the agreement was meaningless unless the in-dividual member companies joined in the agreement. The submission of wage schedules to the National War Labor Board was done pursuant to a statutory provision (§ 802.54c, N.W.L.B.Reg.) authorizing the filing of applications for wage increases by associations. There is no evidence of any special delegation of authority by the membership of the association to the officers of the association to actually act for it in all labor matters.

■ With respect to the element of "good faith" as that term is used in §§ 9 and 11 of the Portal-to-Portal Act it is apparent that the expression refers to the actual state of mind of the employer and also where the facts so warrant, to his duty to inquire and to act as a reasonable man would act in the circumstances. In the "General Statement as to Effect of the Portal-to-Portal Act of 1947", 29 C.F.R. 790 the Wage and Hour Administrator stated: "One of the most important requirements of sections 9 and 10 is proof by the employer that the act or omission complained of and his conformance with and reliance upon an administrative regulation, order, ruling, approval, interpretation, practice or enforcement policy, were in good faith. The legislative history of the Portal Act makes it clear that the employer's 'good faith' is not to be determined merely from the actual state of his mind. Statements made in the House and Senate indicate that 'good faith' also depends upon an objective test—whether the employer, in acting or omitting to act as he did, and in relying upon the regulation, order, ruling, approval, interpretation, administrative practice or enforcement policy, acted as a reasonably prudent man would have acted under the same or similar circumstances. 'Good faith' requires that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry."

■ I have concluded that a member of the New York Shipping Association was chargeable only with such information as the officers and counsel of the Association actually conveyed to the individual members, and only from the time the information was actually conveyed to the member.

Information possessed by the Association's officers and counsel, which was never actually conveyed to a member, is not chargeable to the member. Restatement of the Law of Agency, § 268 (comment c) and § 275 (comment b).

■ The Fair Labor Standards Act became effective October 24, 1938. On November 29, 1938 a specific inquiry (Ex. AA) concerning the payment of overtime under the Longshoremen's agreement was directed to the Wage and Hour Administrator. He referred the inquiry to the Regional Attorney of the Pacific Coast Regional Office of the Wage and Hour Division at San Francisco. Another letter (Exs. N and NN NNN), restating the inquiry, was directed to the Regional Attorney on December 1, 1938 and the opinion of the Regional Attorney was received by the Industrial Association of San Francisco on December 6, 1938. (Ex. 00,000) This letter (the Dorothy Williams letter) clearly and explicitly stated that the "straight time rate" in the collective bargaining agreement was the "regular rate", within the meaning of Section 7(a) of the Fair Labor Standards Act, to be used in calculating the overtime rate. The Regional Attorney in this instance was an authorized deputy of the Administrator to whom he had specifically delegated authority in the matter. Burke v. Mesta Mach. Co., D.C., 79 F.Supp. 588, 607. Her letter was an opinion letter and constituted an administrative ruling within the terms of Section 9. Bauler v. Pressed Steel Car Co., D.C., 81 F.Supp. 172, 176; Moss v. Hawaiian Dredging Co., D.C., 83 F.Supp. 528, 530; Wage & Hour Division Interpretative Bulletin, General Statement as to Effect of Portal-to-Portal Act of 1947, 29 C.F.R. 790. The defendant Huron had knowledge of this correspondence and relied on the Regional Attorney's letter (Ex. 00,000) in paying overtime to its employees.

The fact that the defendant Huron had paid overtime in accordance with the terms of the union contract prior to having, learned of the Regional Attorney's ruling does not weaken the contention that Huron continued to pay such overtime in reliance on the letter of December 6, 1938. The facts set forth in Findings of Fact Nos. 62 to 81 show that there was such reliance in continuing the practice. That is sufficient. Asselta v. 149 Madison Avenue Corp., D.C.S.D.N.Y.1950, 90 F.Supp. 442.

On June 15, 1942 the defendant, Huron, entered into a stevedoring agreement with the United States through the Army Corps of Engineers. An exchange of correspondence resulted in an approval of the wage schedules of Huron based upon the War Department's examination of the union collective-bargaining agreement and the schedules. This approval was also an administrative ruling, although by a different agency, upon which the defendant Huron relied in continuing its pay practices under the union collective bargaining agreement. The Army was an agency of the United States. Acting through its Corps of Engineers it engaged in a vast number of transactions with private employers. The cases indicate that it had received numerous inquiries concerning the application of the Fair Labor Standards Act to the work covered by its contracts, and that agency was cognizant of the problems of the application of that Act to its contract at the time it approved the defendant Huron's collective bargaining agreement and its wage schedules.

On November 19, 1942 the National War Labor Board formally approved, by order, the wage schedules which were submitted to it together with a copy of the collective bargaining agreement between the members of the New York Shipping Association and the International Longshoremen's Association. The defendant, Huron, was a member of the Association at that time and was notified of the National War Labor Board's approval. This was a further administrative order upon which the defendant Huron relied in continuing its pay practices. The facts in connection with the National War Labor Board's approval are set forth in Findings of Fact Nos. 104–111 inc.

■ On March 24, 1943 the defendant Huron also submitted wage schedules, showing straight time and overtime rates, to the War Shipping Administration in the circumstances set out in Findings Nos 114

to 134. These schedules were approved by War Shipping Administration on June 6, 1943. This likewise constituted an order of an agency of the United States upon which the defendant Huron, in continuing its pay practices, was entitled to and did rely, within the meaning of Section 9.

On May 15, 1943 the case of International Longshoremen's Association v. National Terminals Corp., 50 F.Supp. 26 was decided by the United States District Court, Eastern District of Wisconsin, holding that in computing overtime compensation payable under the Fair Labor Standards Act, a contract definition of overtime was not controlling where the overtime mentioned therein was the contract rate to be paid for night, Sunday and holiday work. In January of 1944 the New York Shipping Association and its members, including the defendant Huron, were made cognizant of this District Court decision. It may be presumed from the nature of the problem and the operation of the New York Shipping Association that Huron was at this time fully informed of the decision in the National Terminals Corp. case.

Findings of Fact Nos. 153 to 156 set forth the facts with relation to a letter (Ex. 144) by the Territorial Representative of the Wage and Hour Administrator in Puerto Rico, addressed to Lykes Bros. Co. under date of July 1, 1943, and the institution of suits by longshoremen in Puerto Rico.[15] The letter, sent to a steamship company, stated that the contract overtime was in reality a regular rate for working in undesirable hours. The defendant Huron was not cognizant of the correspondence or the institution of the suits until about January 1944.

On October 15, 1943 the Wage and Hour Administrator directed a letter (Ex. 140) to the War Shipping Administration in which he described the stevedoring company pay practices and expressed the view that they constituted a violation of the overtime pay provisions of the Fair Labor Standards Act. This letter was brought to the attention of the New York Shipping Association

in November 1943 but it was not until January 1944 that Huron may be said to have had notice of the contents of the letter. The facts and circumstances surrounding the Wage and Hour Administrator's letter of October 15, 1943 are set forth in detail in Findings of Fact Nos. 158 to 179 and 182 to 196.

Although the defendant Huron learned of the Wage and Hour Administrator's view in or about January 1944, the Administrator did not apprise the defendant Huron or the other stevedores of his position. Instead, he conveyed his views to the War Shipping Administration, with which the defendants had signed Warshipsteve contracts. The problem became one to be resolved between two government agencies, because they held conflicting views. To that end, investigations were conducted, conferences were held, correspondence was exchanged, and other government agencies joined in the conferences. The defendants were informed by New York Shipping Association of the developments in this situation during the period of January 1944 to January 1945. During the year 1944 new Warshipsteve contracts were executed with defendants without material change. The General Counsel for War Shipping Administration formally advised one stevedoring company to compute overtime on the basis of the contract straight time rates. As stated in Finding No. 168, "The conduct and activities of the War Shipping Administration, during this period were of such a nature as to lead the New York Shipping Association and through it, the defendants, to conclude that War Shipping Administration considered the New York pay practices to be in conformity with the Fair Labor Standards Act".

After January 1945, when the situation involving the collective bargaining agreement and the Fair Labor Standards Act had been thoroughly examined by various government agencies and the Administrator of the Wage and Hour Division, the latter took no steps to affirmatively enforce the views set forth in his October 15, 1943 letter, although several suits had been

15. Barbora v. Bull Line, instituted, 7/14/43; Rodriquez v. Bull Line, instituted, 11/6/43. See Finding of Fact No. 155.

instituted by individual longshoremen, and although he was cognizant that the individual employers could take no action without the approval of the War Shipping Administration, and although he must have been further cognizant of the tremendous potential liability that was piling up against the stevedores and the United States, if the Wage and Hour Administrator's view was correct.

The New York Shipping Association wrote the War Shipping Administrator on January 2, 1945, (Ex.121A) advising him that under their contracts its members would look to the War Shipping Administration for reimbursement and indemnification for any possible additional liabilities to which they might become subject under the provisions of the Fair Labor Standards Act. In the same month the War Shipping Administration directed all stevedores to certify that all labor standards had been complied with, when billing for services. In view of the overtime issues, already raised, the stevedores requested an amendment to the certification to exclude the Fair Labor Standards Act. On April 2, 1945, the War Shipping Administrator replied (Ex.MM–3) as follows:—

"We are familiar with your interpretation and application of the Fair Labor Standards Act in respect of overtime compensation provided by applicable collective bargaining agreements covering stevedore operations on all Coasts, and we concur in it. Furthermore, we are convinced that the interpretation of said Act advocated by you and the application thereof adhered to are essentially in the best interests of the Government in that the over-all cost of stevedore operations to the Government in connection with its activities in the prosecution of the present war will thereby be measurably decreased. Accordingly, we would be obliged to make affirmative objection to any contemplated or other change in such interpretation or application of said Act, unless stevedore contractors are so directed by a court of competent jurisdiction.

"The certification in the above prescribed form that 'all statutory requirements as to American production and labor standards' have been complied with is fully satisfied by the practice of the stevedore industry with respect to the Fair Labor Standards Act, and such certification constitutes no more than a statement that the stevedore contractors in good faith believe that they have complied with the Fair Labor Standards Act as applicable to stevedore operations here involved. Since this position conforms to our views in the matter, there can be no question as to the good faith of the stevedore industry in this respect. We also take occasion to assure you that in the unlikely event that such interpretation and application of the Fair Labor Standards Act should be determined to be erroneous, we would under no circumstances consider that the certification aforesaid was in any way prejudicial to any of the interests of the stevedore contractors in the matter, including specifically any claims which they have against the Government for reimbursement of the additional liabilities imposed by the Fair Labor Standards Act under such a determination. Stevedore contractors to whom copies of this letter are transmitted may sign the form of certification presently required in reliance upon the foregoing assurances."

Thereafter the War Shipping Administration at the request of the stevedores executed an addendum to the Warshipsteve agreements, which amounted to an agreement of indemnification. (Ex. NN) Knowledge of these facts and of the correspondence was possessed by the defendant Huron. I am of the opinion that the execution of the addendum is a factor to be considered in the light of all the surrounding circumstances bearing on the question of good faith and reliance. It is not determinative of that question. It was additional protection in the event that Admiral Land's letter of April 2, 1945 (Ex. MM–3) might not be considered sufficiently formal to bind the government, if the stevedores were obliged to enforce the promises contained therein.

These defendants were caught between the conflicting views of two governmental agencies. The one, Wage and Hour Division, having charge of administering the Fair Labor Standards Act, had the power

to enforce compliance by application to the courts and thus obtain a prompt adjudication. But it did nothing; it made no formal ruling directed to the industry. The other, the War Shipping Administration, as a practical matter, controlled the employing stevedores who had to look to the War Shipping Administration for the regular payment of their bills. The War Shipping Administration affirmatively rejected the Wage and Hour Administrator's views and made a formal ruling that defendants' pay practices were correct. In these circumstances the defendants naturally sought a formal document confirming their right to indemnification, if the War Shipping Administration's ruling was not correct. The letter of April 2, 1945 was accordingly supplemented by the addendum to the Warshipsteve contracts.

In Curtis v. McWilliams Dredging Co., 191 Misc. 1022, 78 N.Y.S.2d 317, 328, there was a very similar situation involving the Wage and Hour Division and the War Department. In that case, as here, the contracting Agency had to approve any change in pay practices and specifically directed the defendant employers to continue their pay practices despite the opinion of the Wage and Hour Administrator. The Court there held: "And, indeed, what was there for the defendants to do? The plaintiffs suggest that there was an absence of good faith on the defendants' part and point to the differences of opinion that developed between the wage and hour administrator and the War Department, especially in reference to the ruling requested by the Caribbean Area Corps of Engineers. It does not appear that that ruling related to cost-plus contractors and it does appear that the Secretary of War at no time deferred to the opinion of the administrator in this respect. The testimony before me indicates nothing more than an exchange of ideas between the War Department and the administrator; and even after the issuance of the administrator's opinion in 1942, the Secretary of War in April, 1943, took a different view of the matter. As between the administrator and War Department, obviously, the defendants had

to abide by the rulings of the department with which it was dealing. It could not with impunity act in defiance of those rulings. To repeat the language of the President in approving the Portal-to-Portal Act, the defendants have met 'an objective test of actual conformity with an administrative ruling or policy.' "[15a]

■ The defendant companies could make no personal gain by wilfully failing to comply with the Fair Labor Standards Act. The Warshipsteve contracts provided that the government would pay all the direct costs of labor. The stevedores were subject to carefully detailed instructions of the War Shipping Administration, an agency given broad war powers, and they could not change their pay practices without the approval of that agency and of the National War Labor Board. In the Interpretative Bulletin, "General Statement as to the Effect of the Portal-to-Portal Act of 1947" issued by the Wage and Hour Administrator, Sec. 790.15(d) the following is stated: "(d) Insofar as the period prior to May 14, 1947, is concerned, the employer may have received an interpretation from an agency which conflicted with an interpretation of the Administrator of the Wage and Hour Division of which he was also aware. If the employer chose to rely upon the interpretation of the other agency, which interpretation worked to his advantage, considerable weight may well be given to the fact that the employer ignored the interpretation of the agency charged with the administration of the Fair Labor Standards Act and chose instead to rely upon the interpretation of an outside agency. Under these circumstances 'the question could properly be considered as to whether it was a good faith reliance or whether the employer was simply choosing a course which was most favorable to him.' "

In the case at bar it did not mean more money in the pockets of the stevedores under their Warshipsteve contracts to follow the ruling of the War Shipping Administration. Their fee was fixed. The Government had to bear any increased labor costs. I am persuaded that the

15a. However the Court held § 9 unconstitutional. See Footnote 27 infra.

conduct of the defendant Huron in paying overtime, according to the view and ruling of the War Shipping Administration, came within the intent and purpose of Section 9 of the Portal-to-Portal Act of 1947. The stevedore for all practical purposes had no choice. He cannot be said to have made a deliberate choice of a course more favorable to himself.

The defendant Bay Ridge Operating Co. Inc. did not rely on the so-called Williams letter of December 6, 1938 (Ex. 00,000), nor on an approval of the pay practices by the Army Corps of Engineers, as did Huron. The trial record does not contain any proof of knowledge of that letter or reliance thereon by the officers of Bay Ridge. On November 4, 1938, Mr. Walker, President of Bay Ridge Operating Co. Inc. did write the Wage and Hour Administrator three specific inquiries concerning the pier watchmen. The letter (Ex. 00–1) recited that the stevedore week was forty-four hours at straight time and any other time worked, time and one-half. This letter and the Wage and Hour Administrator's reply (Ex. 00–2) did not present the problem of whether the "contract overtime" and the practice of paying the contract overtime to longshoremen for undesirable hours and also for work in excess of forty-four hours was a compliance with the overtime pay requirements of the Fair Labor Standards Act. The Administrator's reply did not constitute a ruling or opinion on that question. The record does not reveal that Bay Ridge entered into any stevedoring contracts with the War Department, that it exchanged any correspondence with the War Department on the question of pay practices, or that it had knowledge of the correspondence upon which the defendant Huron relied.

The first factor in the pattern of circumstances which establishes a case of reliance for the Bay Ridge Company is Interpretative Bulletin No. 4, issued by the Wage and Hour Administrator October 21, 1938. The pertinent parts of that Bulletin are set forth in Findings of Fact Nos. 85 to 93 incl. As originally issued this bulletin did not set up any standard which would lead Bay Ridge to believe that its

pay practices in relation to overtime were not in conformity with the Act. The longshoremen were not paid either on a piecework basis or a weekly wage basis; they were paid on an agreed hourly rate under the contract, which according to the Administrative Bulletin could be used as the regular rate of pay upon which overtime was to be calculated. While the bulletin was general in its language and not specific with respect to the problem as it existed in the stevedoring industry, it did furnish a basis for Bay Ridge's belief that its pay practices were in conformity with the provisions of the bulletin.

When Interpretative Bulletin No. 4 was revised and amended in December 1939 and July 1940, paragraphs 14, 69, 70 and 71 were added to the Bulletin. These paragraphs are set forth in Finding of Fact No. 88. Both the Court of Appeals and the United States Supreme Court, in the appeals in these cases, considered the Interpretative Bulletin. The Court of Appeals, 162 F.2d 665, thought paragraph 69 "suggested" the same conclusion as that reached by that court. And in Ferrer v. Waterman Steamship Corp., D.C. Puerto Rico 1949, 84 F.Supp. 680, 696, Judge Chavez held that paragraphs 13, 69 and 70 of the Bulletin did not "clearly and unmistakenly approve the pay practices" of the stevedore defendants in the Puerto Rican suits. He observed that since the facts with which the stevedores were confronted were not "clearly and completely identical with the examples set out under Paragraph 70 of the Bulletin" the defendants should have been put on inquiry.

While it is true that the Bulletin does not "clearly and unmistakenly" support the pay practices of the defendants in these cases, nevertheless it was ambiguous enough to warrant a reasonable business man in concluding that he was complying with the Act in paying overtime computed on contract straight time, in the manner and under the circumstances in which the defendants were computing the overtime of the longshoremen. While the Bulletin may be clear enough now, when read in the light of the decision of the Supreme Court in Bay Ridge Operating Co. v.

Aaron, 1948, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502 defining, explaining and illustrating regular rate and regular hours, it was not so clear prior thereto as to exclude an interpretation which supported the pay practices of the defendants. Indeed, the three dissenting Justices, Mr. Justice Frankfurter, Mr. Justice Jackson and Mr. Justice Burton, made this comment in note No. 12, 334 U.S. on page 494, 68 S.Ct. on page 1211 "The Interpretations of the Wage-Hour Administrator pertinent to this case are conflicting and inconclusive. Citation of the most relevant should suffice. Cf. §§ 69, 70, Interpretative Bulletin No. 4, Wage and Hour Division, Department of Labor".

In these circumstances the Bay Ridge Company may properly be said to have acted in conformity with and in reliance on an administrative ruling (Amended Bulletin #4) by an agency of the United States, the Wage & Hour Division of the Department of Labor. Thereafter, the circumstances of Bay Ridge's continuing reliance on United States agency rulings and interpretations are the same as those discussed in relation to the Huron company. For the reasons hereinabove stated in considering the facts of the Huron case, I have concluded that the conduct of Bay Ridge also comes within the intent and scope of Section 9 of the Portal-to-Portal Act of 1947, and the defense afforded by Section 9 is available to Bay Ridge.

In the longshore industry a custom had developed, and continued with the approval of the International Longshoremen's Association, by which longshoremen employed as headers, gangwaymen and assistant foremen received a small additional compensation, called a heading or skill differential, for performing work involving additional responsibility. These skill differentials, amounting to 5 cents, 5 cents and 15 cents respectively, were not set forth in the collective bargaining agreement but were added by custom to the straight time rate for the kind of cargo being handled. In computing the overtime rate for longshoremen employed in these spe-

cial capacities the defendants did not include the differential in the regular or straight time rate when computing the overtime, and the overtime paid did not amount to one and one-half times the employee's regular rate because only the differential, and not one and a half times the differential, was added to the contract overtime rate. In other words the men thus specially employed received only the skill differential, added to their contract straight time and their contract overtime rate. Judge Rifkind's Findings of Fact and Conclusions of Law in this respect were approved by the Court of Appeals.[16]

By analogy, the job differential ruling of the Supreme Court in this case requires a similar conclusion where a skill differential is involved. At pages 468–469 of 334 U.S. at page 1198 of 68 S.Ct. the Court stated:—"Where an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such wage represents a shift differential or higher wages because of the character of the work done * * *. Such payments enter into the determination of the regular rate of pay. * * * If an employee receives from his employer a high hourly rate of pay for hard or disagreeable duty, he is entitled to the statutory excess compensation figured on his actual pay".

The skill differentials were not part of the collective bargaining agreements but were paid by custom. No reference to them was made in the letter (Ex. AA) which was given to the Wage and Hour Administrator on November 29, 1938. They were not referred to in the letter that was directed to the Pacific Coast Regional Counsel (Ex. N). In the schedules (Ex. HH–1) submitted to the War Department by Huron Stevedoring Corp. the only reference is a listing of "Stevedore Headers, $1.25 per hour—$1.85 hr. overtime". No reference is made to gangwaymen or assistant foremen. In all other cases in the schedule, where the hourly straight time rate is shown for different classes of employees, the overtime rate is one and a half times the straight time rate. On

16. Finding of Fact 43(a) and Conclusions of Law Nos. 3 and 4.

October 15, 1942 certain schedules of wage rates and increases, annexed to a Wage Agreement Stipulation executed October 14, 1942 by the New York Shipping Association and the International Longshoremen's Association, were submitted to the National War Labor Board together with copies of the collective bargaining agreements as set forth in Findings of Fact Nos. 105–111 incl. (Exs. II 1–6). The collective bargaining agreements clearly showed the facts with respect to the cargo differentials which appeared in Clause 4(b), (c), (d) and (e) of the contracts as well as in the schedules annexed to the Wage Agreement Stipulation. None of this data contained any reference to the skill differentials which were paid to gangwaymen, headers or assistant foremen or to the overtime rates paid for that work. On December 12, 1942, Report No. 203 was made by the New York Shipping Association to its members. It contained the following statement: "It should be noted that certain classifications of labor, *such as* Gangwaymen, Headers, Hatch Foremen, Head Foremen and Assistant Head Foremen, are not specifically referred to in any of our agreements. Although their wage rates were, by custom, generally adjusted in harmony with any wage adjustments reached under the agreements, they were not specifically subject to collective bargaining and could not, therefore, be included in the Wage Agreement Stipulation. Wage increases to *such* additional classifications of labor may *not* be granted, therefore, unless and until any such proposed increases are submitted to and are approved by either, as the case may be, the National War Labor Board through its Regional Office * * * or by the Bureau of Internal Revenue of the Treasury Department through the Regional Office of its Salary Stabilization Unit.

* * * With respect to such additional classifications of labor, the Association will endeavor to handle the matter for all of its members by filing appropriate applications for any agreed categories in which the members generally may be concerned."

On December 22, 1942 the New York Shipping Association submitted to the National War Labor Board an application for approval of wage increases to certain designated types of employees, not mentioned in the collective agreements, including gangwaymen and headers, but not assistant foremen.

In Report No. 205 of the New York Shipping Association to its members dated December 23, 1942, the following appears: "The Board's printed 'Form 10' was appropriately filled out for the general information required and a 'Supplemental Statement' (the text of which is attached hereto) was prepared to cover the terms of the proposed adjustment for a total of from 1000 to 2000 employees, information regarding the employees concerned, wage rates, etc. It was also stated that *these* particular wage adjustments would not be made the basis of a request for an increase in any existing price ceilings."

The application and supplemental statement did refer to the skill differentials of these designated longshoremen, but no reference was made to their overtime rates. Form 10 may or may not have made such reference, but it is not in evidence.

Findings of Fact Nos. 118 to 130 set forth the facts surrounding the submission of wage schedules by the defendants to War Shipping Administration. In the schedules submitted to the War Shipping Administration by the Maritime Association, which were subsequently adopted by Bay Ridge, the "Straight Time Hourly Rate" and the "Overtime Hourly Rate" for gangwaymen and headers was shown and it appeared that in each case the overtime rate was somewhat less than time and one half the straight time rate. In another column entitled "Wage & Hour Law Overtime Hourly Rate (when applicable)" the hourly overtime rate did equal one and one half times the straight time rate. The Schedules submitted by Huron were identical in these particulars.

It does not appear that the method of payment of overtime in relation to these skill differentials was considered by the Wage and Hour Administrator, the Pacific Coast Regional Counsel for the Wage and Hour Division, or the War Department. There is no evidence that the nature

or amount of overtime payments in these instances were considered by the National War Labor Board.[17] The wage rates of gangwaymen, headers and assistant foremen were not set forth in the collective bargaining agreements. It is true that these rates appeared in the schedules submitted to the War Shipping Administration. However, they were coupled with a reference to the statutory overtime rate required by the Wage and Hour Act "when applicable" and do not appear to be set forth in such detail and clarity that the approval of the War Shipping Administration can be said to have been based upon a consideration of the problem actually involved in computing overtime rates for those who received a skill differential.

Accordingly, there was no administrative ruling, order or interpretation in relation to the overtime payments for skill differentials upon which the defendants could rely, and the claims of certain plaintiffs for weeks involving the skill differentials, are not barred by Section 9 of the Portal-to-Portal Act.

*The defense based on Section 11 of the Portal-to-Portal Act of 1947*

The defendants' eleventh defense[18] pleads Section 11 of the Portal-to-Portal

Act of 1947, 29 U.S.C.A. § 260, which provides: "Liquidated damages—In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

For reasons hereinabove stated I have concluded that Section 9 of the Portal-to-Portal Act of 1947 is a complete bar to all the claims in this suit, except a comparatively few and small claims for weeks in which the defendants failed to include 50% of the "skill differential" in calculating the overtime payment for hours in excess of forty. In those instances where the contract overtime rate was somewhat less than one and a half times the contract regular rate, because the extra 50% was not calculated on the "skill differen-

17. Exhibit KK, an interoffice memorandum from the Asst. Deputy Admn'r, Ship Operations to the Administrator, W.S.A. in connection with Huron's schedules submitted to W.S.A. contains the following statement: "All of the wage rates down to and including 'hatch foremen,' were increased effective October 1, 1942, to the rates shown on the attached statement and were approved by the National War Labor Board on November 19, 1942, and December 31, 1942, both approvals retroactive to October 1, 1942." However, this is not sufficient evidence, as to what details in relation to skill differential overtime payments, were before the N.W.L.B.

18. "For An *Eleventh* Separate And Distinct Partial Defense To The Causes Of Action Of All Plaintiffs

"14. Defendant says that section 11 of the Portal-to-Portal Act of 1947 provides that in case of actions like the present one in which the plaintiffs seek to recover unpaid overtime compensation and liquidated damages under the Fair Labor Standards Act of 1938 as amend-

ed, ' * * * if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16(b) of such Act.'

"The defendant says that in paying plaintiffs as it did (the act or omission of not paying them otherwise being the basis of the present actions) the defendant was acting in good faith in the belief that its act or omission was not a violation of said statute and that the defendant had reasonable grounds for so believing; and that, in the event of a finding of liability of the defendant to the plaintiffs, the court in the exercise of its sound discretion under said section 11 should award no liquidated damages to the plaintiffs."

tials" as well as the "straight time", there was no proof that any government agency approved this payment practice. The "skill differential" to assistant foremen, headers and gangwaymen was added to the contract straight time hourly rate as a matter of "custom"; but the "skill differential" was not referred to in any way in the union collective-bargaining agreement although the "cargo differential" was. The payrolls of the defendants included the "skill differential" added to the "straight time", and it may have been known to those who checked the payrolls on the part of the War Shipping Administration, but the proof does not establish anything that amounts to a ruling, approval, interpretation, practice or policy of a government agency, in relation to the "skill differential", such as has been shown in relation to "cargo differentials" where overtime payments were involved.

But the facts in the instant case are such as to require the exercise of judicial discretion against awarding any liquidated damages in respect to those claims or parts of claims, to which Section 9 is not a complete bar. In fact, if none of plaintiffs' claims were barred by Section 9 of the Portal-to-Portal Act of 1947, I would not include any liquidated damages in the judgment. The defendants paid the plaintiffs in accordance with the terms of a collective bargaining agreement negotiated by the International Longshoremen's Association, an agreement similar in terms to those in effect in the stevedoring industry throughout the United States, and following the pattern of other longshoremen's collective agreements in effect prior to the enactment of the Fair Labor Standards Act. In Ferrer v. Waterman Steamship Co., D.C.Puerto Rico 1949, 84 F.Supp. 680, 696, the existence of a collective bargaining agreement was a factor which the court said should operate to bar the recovery of liquidated damages. Although the "skill differential" was paid as a matter of "custom" to certain types of employees and was not mentioned in the written agreement, the amount paid was known to and had the approval of the union officials. There does not appear to

have been any objection on the part of the union to not including 50% of the skill differential in the overtime pay of those entitled to the skill differential. Apparently there were no complaints until this suit was commenced. The facts as to the "skill differential" were developed during the trial before Judge Rifkind.

As to the "cargo differential", the defendants submitted their pay schedules to the War Shipping Administration which formally approved them. The National War Labor Board, which was not authorized to take any action "inconsistent with the provisions of the Fair Labor Standards Act of 1938" also formally approved the defendants' wage scales, based on collective bargaining agreements which were also submitted to the Boards. (Ex. II–2.) These formal approvals of the wage agreements constituted part of each agencies administrative work and was in addition to the checking of payrolls for pay or audit purposes by field representatives of the contracting agency. Such approvals are indicia of good faith in cases where the employer relied on them and would constitute good grounds for the employer's belief that his act or omission was not a violation of the Fair Labor Standards Act of 1938. Wells v. Radio Corporation of America, D.C.S.D.N.Y. 1948, 77 F.Supp. 964. When there are added to these factors the letter of the Regional Attorney for the Wage and Hour Division at San Francisco (Ex. 00,000, of which Huron had knowledge) specifically approving the pay practices used by the defendants; the letter dated April 7, 1944 (Ex. IIIIIII) of the Assistant General Counsel for the War Shipping Administration to A. H. Bull & Co., of which the defendants had knowledge; the renewal of the Warshipsteve contracts with defendants by the War Shipping Administration without change; the letter of Admiral Land dated April 2, 1945 (Ex. MM–3) addressed to the Maritime Association, of which the defendants had knowledge; the decision of the Department of Justice, the War Shipping Administration, and the Army and the Navy, formulating a policy as to wage payments and as to the defense

of this type of litigation; and the failure of the Wage and Hour Administrator to take any court action against any individual stevedore to enforce his views as to the coverage of the Fair Labor Standards Act—when all this is taken into consideration, the contention of the defendants that they acted in good faith and with reasonable grounds for their belief that they were not violating the Fair Labor Standards Act when they paid the Union contract overtime rates is established by very clear and convincing proof. See Jackson v. Northwest Airlines, D.C.Minn.1948, 76 F. Supp. 121, reversed on other grounds 8 Cir., 175 F.2d 74; Conwell v. Central Missouri Telephone Co., D.C.W.D.Miss.1948, 76 F.Supp. 398, affirmed 8 Cir., 170 F.2d 641; Bauler v. Pressed Steel Car Co., D.C. W.D.Ill.1948, 81 F.Supp. 172; Moss v. Hawaiian Dredging Co., D.C.N.D.Cal. 1949, 83 F.Supp. 528; Ferrer v. Waterman Steamship Co., D.C.Puerto Rico 1949, 84 F.Supp. 680, 696. In the cited cases the courts have sustained a Section 11 defense upon varying factual situations, which in many respects are similar to those in the case at bar as summarized above.

## Defense based on Public Law No. 393 of the 81st Congress

A supplemental defense, added to the defendants' answer by leave of the Court, on May 16, 1950, pleads the provisions of Public Law 393, 81st Congress, effective January 25, 1950, which, among other things, amended Sections 7 and 16 of the Fair Labor Standards Act of 1938. Section 7, as amended, provides in part as follows:

"Sec. 7(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

"Sec. 7(d) As used in this section the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include— * * *."

Subdivisions (1), (2), (3) and (4) are not pertinent. Those exclusatory subdivisions relate to (1) "gifts"; (2) any payments to an employee "which are not made as compensation for his hours of employment", such as payments made during vacations, holidays, illness and travelling expenses; (3) optional bonus payments and payments into a profit-sharing plan, and talent payments to a theatrical or radio performer; (4) contributions irrevocably made by an employer to a trustee to provide for employees' pensions and various types of insurance. The remaining paragraphs of Section 7(d) are pertinent and provide that "regular rate" shall not be deemed to include:

"(5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or forty in a workweek or in excess of the employee's normal working hours or regular working hours, as the case may be;

"(6) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days; or

"(7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding forty hours), where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek."

It will be noted that paragraph (5) of Section 7(d) of the Fair Labor Standards

Act relates to what the Supreme Court, in the case at bar, considered "true overtime" to be excluded in determining the regular rate of pay; paragraph (6) covers what the Supreme Court termed "large wages paid for work in undesirable hours", which the Supreme Court held was not to be excluded in determining the regular rate of pay; paragraph (7) is in effect what the Supreme Court described as extra pay by contract for work outside the contract specified clock pattern, which the Supreme Court held should not be excluded in calculating the regular rate of pay, unless it came within the Supreme Court's definition of true overtime. Thus paragraph (5) did not enlarge the scope of the Supreme Court's exclusions, but paragraphs (6) and (7) did. Indeed, paragraphs (6) and (7) of Section 7(d) of the Fair Labor Standards Act are in effect the same as the additions made to the old subdivision (e) of Section 7 of the Fair Labor Standards Act of 1938 by the first part of Public Law 177 of the Eighty-first Congress, approved July 20, 1949.[19] See Statement of General Policy or Interpretation, Wage and Hour Division, Department of Labor, 17 F.R. 623, 642, Feb. 4, 1950; 29 C.F.R. 778.27. House Report No. 121, 81st Congress, 1st Session, which accompanied H.R. 858, later Public Law 177, shows that that was the purpose of Congress, and that Public Law 177 was enacted because of the effect of the Supreme Court's decision in the Bay Ridge case.

Public Law 393 of the Eighty-first Congress also made the following amendment to Section 7 of the Fair Labor Standards Act: "(g) Extra compensation paid as described in paragraphs (5), (6) and (7) of the subsection (d) shall be creditable toward overtime compensation payable pursuant to this section."

Section 16 of Public Law 393 reads as follows:

"(e) No employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended (in any action or proceeding commenced prior to or on or after the effective date of this Act), on account of the failure of said employer to pay an employee compensation for any period of overtime work performed prior to July 20, 1949, if the compensation paid prior to July 20, 1949, for such work was at least equal to the compensation which would have been payable for such work had section 7(d) (6) and (7) and section 7(g) of the Fair Labor Standards Act of 1938, as amended, been in effect at the time of such payment." 29 U.S.C.A. § 216b.

"(f) Public Law 177, Eighty-first Congress, approved July 20, 1949, is hereby repealed as of the effective date of this Act." 63 Stat. 920.

Public Law 177, having served its purposes as a stopgap, was repealed when the Fair Labor Standards Act was revised by Public Law 393.

The collective bargaining agreements in effect during the period in suit contain the following provisions with respect to hours and wages:—

"2(a) The basic working day shall consist of 8 hours, and the basic working week shall consist of 44 hours.[20] Men

---

19. "(e) For the purpose of computing overtime compensation payable under this section to an employee—

"(1) who is paid for work on Saturdays, Sundays, or holidays, or on the sixth or seventh day of the workweek, at a premium rate not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days, or

"(2) who, in pursuance of an applicable employment contract or collective bargaining agreement, is paid for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding forty hours), at a premium rate not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek, the extra compensation provided by such premium rate shall not be deemed part of the regular rate at which the employee is employed and may be credited toward any premium compensation due him under this section for overtime work."

20. But overtime, at time and a half, was payable for time in excess of forty hours. This was the practice and understanding

shall work any night of the week, or on Sundays, Holidays, or Saturday afternoon, when required. On Saturday night, work shall be performed only to finish a ship for sailing on Sunday, or to handle mail or baggage.

"(b) Meal hours shall be from 6 a. m. to 7 a. m., from 12 Noon to 1 p. m., from 6 p. m. to 7 p. m., and from 12 Midnight to 1 a. m. * * *

"(c) Legal Holidays shall be: New Year's Day, Lincoln's Birthday, Washington's Birthday, Good Friday on the New Jersey Shore, Decoration Day, Fourth of July, Labor Day, Columbus Day, Election Day, Armistice Day, Thanksgiving, Christmas, and such other National or State Holidays as may be proclaimed by Executive authority. * * *

"3(a) Straight time rate shall be paid for any work performed from 8 a. m. to 12 Noon and from 1 p. m. to 5 p. m., Monday to Friday, inclusive, and from 8 a. m. to 12 Noon Saturday.

"(b) All other time, including meal hours and the Legal Holidays specified herein, shall be considered overtime and shall be paid for at the overtime rate.

"(c) The full meal hour rate shall be paid if any part of the meal hour is worked and shall continue to apply until the men are relieved.

"4. The Wage Scale: The wage scale shall be as follows:—

| General Cargo Agreement | Straight Time | Over-time |
|---|---|---|
| "(a) General Cargo of every description including barrel oil when part of General Cargo, and all General Cargo handled in refrigerator space with the temperature above freezing ................. | $1.25 | $1.87½" 21 |

The provisions of Section 7 of the Fair Labor Standards Act, as amended by Public Law 393, clearly exclude the collective-bargaining contract overtime rate hereinabove listed for work performed on Saturdays, Sundays and Holidays from the computation of the "regular rate" of pay upon which the overtime rate is calculated. Section 7, as amended, likewise excludes from the computation all extra compensation constituting a premium rate paid pursuant to the collective-bargaining agreement for general cargo work and certain other cargo work, outside the basic normal or regular workday as established by that agreement, because the premium rate amounts to time and one-half the "straight time" rate of the collective bargaining agreement, in the case at bar.

As shown above, Section 7 of the Fair Labor Standards Act, as amended by Public Law 393, provides that, in calculating the regular rate of pay, premium payments or extra compensation paid for work outside the basic workday or workweek as established by the collective-bargaining agreement, shall be excluded when such payments are not less than one and a half times the contract straight time rate. § 7(d) (7). The overtime rates set forth in

of the parties to the collective bargaining agreement after the forty hour week provided for in the Fair Labor Standards Act became effective, although it does not appear to have been made part of the written agreement. In an Interpretative Bulletin, 15 F.R. 623, 627; 29 C.F.R. 778.5(d) the Wage and Hour Administrator interpreting Sec. 7(d)(7) of Public Law 393 stated: "Although as a general rule a collective bargaining agreement is a formal agreement which has been reduced to writing, an employment contract for purposes of section 7(d)(7) may be either written or oral. Where there is a written employment contract and the practices of the parties differ from its provisions, it must be determined whether the practices of the parties have modified the contract. If the practices of the parties have modified the written provisions of the contract, the provisions of the contract as modified by the practices of the parties will be controlling in determining whether the requirements of section 7(d)(7) are satisfied".

21. The agreements further provided for wage scales applicable to bulk cargo and special cargo. In four instances the contract overtime rate falls slightly short of time and one-half. (See Findings of Fact Nos. 13 and 19).

the collective-bargaining agreement in the case at bar are time and a half for general cargo, and time and a half for three penalty type cargoes: kerosene, explosives, and damaged cargo. But in four instances of penalty cargoes—(1) cement in bags, (2) bulk cargo ballast and coal cargo, (3) wet hides, creosoted poles, etc., and (4) refrigerator space cargo—the contract overtime rate falls slightly short of an amount equal to one and a half times the contract straight time rate. In those four instances the cargo rates were as follows:—

| Cargo [22] | Straight Time | Contract Overtime | Statutory Overtime | Deficiency |
|---|---|---|---|---|
| Cement | 1.30 | 1.92½ | 1.95 | .02½ |
| Bulk Cargo, etc. | 1.30 | 1.92½ | 1.95 | .02½ |
| Wet Hides, etc. | 1.40 | 2.02½ | 2.10 | .07½ |
| Refrigerated Space | 1.45 | 2.07½ | 2.12½ | .05 |

Although the penalty or extra sum paid for handling that type of cargo during overtime hours was not quite equal to the straight time plus 50%, this deficiency was clearly shown by the contract rates of pay listed in the collective-bargaining agreements and in the schedules which were submitted to and approved by the War Shipping Administration, the National War Labor Board, the Army, and in the case of the collective-bargaining agreements by the Pacific Coast Regional Counsel of the Wage and Hour Division.

There was another type of differential known as a "skill differential", which has been hereinabove discussed under the heading of the Portal-to-Portal Act. Longshoremen employed as headers, gangwaymen and assistant foreman respectively 5 cents, 5 cents and 15 cents per hour in addition to the straight time rates applicable to the kind of cargo being handled. But in computing the overtime rates for longshoremen entitled to any one of the three skill differentials, the defendants did not include 50% of the skill differential.

The deficiency in the skill differentials and certain penalty cargo differentials are referred to in Findings of Fact Nos. 9, 11, 12, 42 and 43a made by Judge Rifkind. His Conclusions of Law Nos. 3 and 4 are as follows: [23]

"3. * * * During those periods when a plaintiff was employed as a header, gangwayman or assistant foreman, as defined in Finding of Fact No. 11, the regular rate was that applicable to the kind of cargo being handled, plus 5 cents, 5 cents and 15 cents per hour respectively.

"4. The defendants did not violate Section 7(a) of the Act, and did not fail to pay the plaintiffs herein compensation for their employment in excess of 40 hours during any workweek at a rate not less than one and one-half times the regular rate at which plaintiffs were employed, during the period in suit, in accordance with the provisions of Section 7(a) of the Act, except (1) in failing to pay some of the plaintiffs in accordance with the provisions of that section in some workweeks in which they worked more than 40 hours and some of their work was performed in the capacity of header, gangwayman or assistant foreman; (2) in some workweeks in which they worked more than 40 hours and some of their work was performed on penalty cargo as referred to in Paragraphs 4(b), 4(c), 4 (d) or 4(e) of the Collective Agreement, as set forth in Finding of Fact No. 9; * * *."

The District Court found the defendants liable for failing to pay statutory overtime in these seven instances (four penalty cargo

22. As set forth in Clause 4(b) (c) (d) and (e) of the collective-bargaining agreement.

23. These conclusions were filed by Judge Rifkind on March 4, 1947 before the Portal-to-Portal Act was enacted, May 14, 1947, and they did not involve a consideration of the Portal Act defenses to these claims.

differentials and three skill differentials). The defendants did not appeal from the decree based upon the Findings of Fact and Conclusions of Law in favor of recovery in those seven instances; but plaintiffs did appeal therefrom on the grounds that the sums allowable thereunder were inadequate.

The Circuit Court of Appeals did not discuss the question in its opinion, but quoted Judge Rifkind's Findings Nos. 42, 43(a) and 11 referring to the differentials, without comment.

The Supreme Court made reference to the penalty cargo differential, 334 U.S. at page 451, 68 S.Ct. at page 1190 of its opinion in this case, as follows: "For four types of cargo the overtime rates were exactly one and a half times the straight time rates; for four other types the overtime rates were slightly less than one and a half times the straight time rates."

No specific reference was made by the Supreme Court to the facts relating to the skill differential, but the court did state that:—"Under the definition, a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work is not an overtime premium". That was written before Public Laws 177 and 393 were enacted.

The provisions of paragraphs (6) and (7) of Section 7(d) of Public Law 393 do not apply to claims of the plaintiffs involving the skill differentials and four certain types of cargo differentials because the premium rate paid did not meet the statutory requirement of one and a half times the straight time rate for like work.[23a] Nevertheless, the Supreme Court ruling as to true overtime may apply in certain circumstances.

If an overtime premium of less than full time and a half was paid to a plaintiff because the work was performed at a time outside the clock pattern of the basic workday as fixed by the employment contract but not because the employee had previously worked eight hours in that day, the premium would not be a true overtime payment under the Supreme Court ruling in this case.[24] But where an employee, who had already worked eight contract straight time hours in a day, thereafter received for additional hours in the day a premium payment slightly less than time and one half the contract straight time rate, the inference is warranted that the premium rate actually paid during the additional hours in that day was paid because of the hours previously worked, and the Supreme Court's ruling that it is true overtime would therefore be applicable. If an overtime premium of less than full time and a half was paid a plaintiff after the first forty hours of work in a week, because of work previously performed in the week, such premium rate would be true overtime under the Supreme Court ruling in this case. A true overtime premium is to be excluded in the computation of the regular rate, and would be creditable toward any overtime compensation due, even though the overtime payment was less than time and one half the straight time rate.

Section 16(e) of Public Law 393, 29 U.S. C.A. § 216b, specifies the retroactive provisions of that statute as follows: "(e) No employer shall be subject to any liability, or punishment under the Fair Labor Standards Act of 1938, as amended (in any action or proceeding commenced prior to or on or after the effective date of this Act), on account of the failure of said employer to pay an employee compensation for any period of overtime work performed prior to July 20, 1949, if the compensation paid prior to July 20, 1949, for such work was at least equal to the compensation which would have been payable for such work had section 7 (d) (6) and (7) and section 7(g) of the

---

23a. Section 9 of the Portal-to-Portal Act however, as previously discussed herein, does bar the claims based upon the cargo differentials. Section 16(b) of Public Law 393 provides:—"(b) Except as provided in section 3(c) and in the last sentence of section 16(c) of the Fair Labor Standards Act of 1938, as amended, no amendment made by this Act shall be

construed as amending, modifying, or repealing any provision of the Portal-to-Portal Act of 1947." 29 U.S.C.A. § 216 note.

24. The employment contract in the Bay Ridge (and Huron) case provided in effect for an eight hour day (8 a. m. to 12 noon and 1 p.m. to 5 p.m.).

Fair Labor Standards Act of 1938, as amended, been in effect at the time of such payment".[24a]

There was no need for making Section 7(d) (5) retroactive because it was in accord with the Supreme Court ruling in the Bay Ridge case. However, Sections 7(d) (6) and (7) were contrary to the Court's ruling in that case and were intended to supplant it in that respect and so they were made retroactive.

Section 7(d) of the F.L.S.A., as amended by Public Law 393, states how the regular rate is to be determined, and what is to be excluded in determining the regular rate where a claim for overtime is asserted. Section 7(g) states what credits the employer is entitled to in calculating his liability for unpaid overtime. Although the application of Section 7(d) (5) (the Supreme Court rule) and Section 7(d) (6) and (7) and Section 7(g), does not eliminate all overtime liability, where the skill differential is involved, nevertheless the application of those sections does so limit the liability that the amount recoverable for overtime may call for the application of the de minimis doctrine.[24b]

The plaintiffs have challenged the constitutionality of Public Laws 177 and 393 of the Eighty-first Congress, contending in their briefs that they are violative of the Due Process Clause of the Fifth Amendment of the Constitution of the United States, in that they constitute an "uncompensated confiscation of a previously vested claim compensatory in character, or an accrued indebtedness arising out of a statute governing the contractual relationship of employer and employee".

In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, the Supreme Court had held that certain employees were entitled to be compensated for overtime activities, which were not compensable by contract or by custom, and which were preliminary or postliminary to the commencement or completion of the work or activity which actually was compensable by contract or custom. The principles of that case, interpreting the Fair Labor Standards Act of 1938, gave rise to unexpected and retroactive employer liabilities in very substantial amounts. Thereafter on May 14, 1947 Congress enacted the Portal-to-Portal Act of 1947 and by Section 2 thereof exempted employers from liability under the Fair Labor Standards Act for any activity of an employee which prior to May 14, 1947 had not been compensated by contract, custom or practice. Section 2(d) of the Act also withdrew from the Federal courts jurisdiction in actions under the Fair Labor Standards Act to enforce liability with respect to any employee activity not compensable by contract, custom or practice. The Portal-to-Portal Act of 1947 operated to bar retroactively actions on claims, such as those in the Mt. Clemens Pottery case, even though the action had been instituted prior to the enactment of the Portal-to-Portal Act of 1947.

The Portal-to-Portal Act of 1947 was enacted after lengthy Congressional hearings. In Section 1 of the Act 29 U.S.C.A. § 251, the Congress set forth a declaration of the purposes of the Act as follows:—

"§ 251. Congressional findings and declarations of policy

"(a) The Congress finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about financial ruin of many employers and seriously impair the capital resources of many others, thereby resulting in the reduction of industrial operations, halting of expansion and development, curtailing employment, and the

---

24a. See also the Conference Report of the House and Senate on Public Law 393, 2 U.S.Code Congressional Service, 1949, 81st Congress at page 2275.

24b. The application of the de minimis doctrine to the claims in these cases is hereinafter discussed at page 178 of 96 F. Supp.

earning power of employees; (2) the credit of many employers would be seriously impaired; (3) there would be created both an extended and continuous uncertainty on the part of industry, both employer and employee, as to the financial condition of productive establishments and a gross inequality of competitive conditions between employers and between industries; (4) employees would receive windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay; (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in; (6) voluntary collective bargaining would be interfered with and industrial disputes between employees and employers and between employees and employees would be created; (7) the courts of the country would be burdened with excessive and needless litigation and champertous practices would be encouraged; (8) the Public Treasury would be deprived of large sums of revenues and public finances would be seriously deranged by claims against the Public Treasury for refunds of taxes already paid; (9) the cost to the Government of goods and services heretofore and hereafter purchased by its various departments and agencies would be unreasonably increased and the Public Treasury would be seriously affected by consequent increased cost of war contracts; and (10) serious and adverse effects upon the revenues of Federal, State, and local governments would occur.

"The Congress further finds that all of the foregoing constitutes a substantial burden on commerce and a substantial obstruction to the free flow of goods in commerce.

"The Congress, therefore, further finds and declares that it is in the national public interest and for the general welfare, essential to national defense, and necessary to aid, protect, and foster commerce, that this Act be enacted.

"The Congress further finds that the varying and extended periods of time for which, under the laws of the several States, potential retroactive liability may be imposed upon employers, have given and will give rise to great difficulties in the sound and orderly conduct of business and industry.

"The Congress further finds and declares that all of the results which have arisen or may arise under the Fair Labor Standards Act of 1938, as amended, as aforesaid, may (except as to liability for liquidated damages) arise with respect to the Walsh-Healey and Bacon-Davis Acts and that it is, therefore, in the national public interest and for the general welfare, essential to national defense, and necessary to aid, protect, and foster commerce, that this Act shall apply to the Walsh-Healey Act and the Bacon-Davis Act.

"(b) It is declared to be the policy of the Congress in order to meet the existing emergency and to correct existing evils (1) to relieve and protect interstate commerce from practices which burden and obstruct it; (2) to protect the right of collective bargaining; and (3) to define and limit the jurisdiction of the courts. May 14, 1947, c. 52, § 1, 61 Stat. 84."

In the instant case the Supreme Court had held, Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502 on June 7, 1948, that the premium pay provided by contract for work outside the hours of the contract basic workday or workweek was part of the regular rate of pay upon which overtime compensation must be computed, unless it was paid for previous work for a specified number of hours in the workweek or workday.

The House of Representatives Committee on Education and Labor and the Senate Committee on Labor and Public Welfare held public hearings on the computation of overtime pay under the Fair Labor Standards Act and the Supreme Court decision in the Bay Ridge case.

In Senate Report No. 402, 81st Congress on H.R. 858 which became Public Law 177, the following was stated: "This

bill is intended as an amendment to section 7 of the Fair Labor Standards Act of 1938 and is designed to correct a situation which has developed in connection with the so-called 'clock overtime' or 'overtime on overtime' issue. While this problem has arisen in a number of industries in this country, it has assumed particular importance in the longshore and stevedoring industries. In those industries, it has become particularly acute because of the decision of the Supreme Court in the case of Bay Ridge Operating Co., Inc. v. Aaron, 1948, 334 U.S. 446 [68 S.Ct. 1186, 92 L. Ed. 1502] and a series of claims instituted in the courts seeking to recover, under the Fair Labor Standards Act of 1938, extra compensation alleged due by reason of the failure of these industries to compute overtime compensation in compliance with that act. Estimates of the possible liability of industry generally vary substantially. The minimum figure which has been cited for the longshore and stevedoring industries is $10,000,000, but other estimates for these industries range up to a figure approximating $300,000,000. In other industries, such as electric and gas utilities, where continuous operations are essential, the potential liability is undetermined but of a substantial nature."

The same Senate Report, No. 402, also states that extensive testimony was taken on substantial issues involved in the overtime problem and that a careful consideration was given to the retroactive features of the bill. Some of the factors noted as persuasive by the Committee were—that the claims were windfall payments in derogation of collective bargaining agreements; that the purpose of the collective bargaining agreement was consistent with the purposes of the Fair Labor Standards Act; that substantial liability threatened the existence of many stevedoring companies. Reference was also made to the Dorothy Williams letter of December 6, 1938. With respect to the argument that the Walling letter of October 15, 1943, was notice to the industry, the Committee said: "These circumstances, i. e., the division of view among responsible Government officials, the length of the period during which the parties had observed this practice without issue being raised, and the fact that there was a reasonable question as to the correctness of the Administrator's view, deprive the notice argument of much of its persuasive force."

In the Senate Report on this Bill, which was superseded by Public Law 393 on October 26, 1949, containing similar provisions with respect to contract overtime, the following appears (p. 9): "We believe that the overtime-on-overtime claims cannot be distinguished from the claims covered by the Portal-to-Portal Act. In both cases the claims arose under the Fair Labor Standards Act and would not have existed were it not for that law; in both cases, the claims arose by reason of the failure of Congress to define a basic term in that Act * * * the 'workweek' in the portal-to-portal situation and 'regular rate' in this overtime-on-overtime situation; in both cases, prosecution of the claims violated the spirit of collective-bargaining agreements; in both cases, the filing of suits was deplored by responsible A. F. of L. officials; in both cases, the collection of claims would unfairly penalize employers who attempted in good faith to comply with the Wages-and-Hours law. Indeed, in every important respect the overtime-on-overtime claims closely parallel the portal-to-portal claims. In our opinion, the factual and legal findings recited in the Portal-to-Portal Act are equally applicable here, and the situation requires the same expeditious and equitable treatment by Congress."

The factual circumstances which called for the enactment of Public Laws 177 and 393 closely paralleled, in the judgment of Congress, the situation which gave rise to the enactment of the Portal-to-Portal Act of 1947. The remedial nature and character of the statutes are very similar; the principles of construction and the standards of constitutional validity to be applied to each should not be different.

 The enactment of the Fair Labor Standards Act of 1938 and of the Portal-to-Portal Act of 1947 was in each instance an exercise of Congressional

power to regulate commerce. United States v. Darby, 312 U.S. 100, 657, 61 S. Ct. 451, 85 L.Ed. 609; Battaglia v. General Motors Corp., 2 Cir., 1948, 169 F.2d 254. The enactment of Public Laws 177 and 393 represented the exercise of the same Congressional power. Of course, the exercise of that power is subject to the restrictions of the Fifth Amendment of the Constitution,[25] and in exercising its powers to regulate commerce Congress cannot, in an arbitrary or discriminatory manner, withdraw from private individuals any rights which have vested in them or rest upon private contracts.

In upholding the constitutionality of the Portal-to-Portal Act, the courts have held that the rights which employees acquired under the Fair Labor Standards Act were not vested, that they were statutory rights created by Congress, and that as long as they had not ripened into final judgment they were subject to being extinguished by Congress. Rogers Cartage Co. v. Reynolds, 6 Cir., 1948, 166 F.2d 317; Seese v. Bethlehem Steel Co., 4 Cir., 1948, 168 F.2d 58; Fisch v. General Motors Corp., 6 Cir., 1948, 169 F.2d 266, certiorari denied 335 U.S. 902, 69 S.Ct. 405, 93 L.Ed. 436; Asselta v. 149 Madison Avenue Corp., D.C.S.D.N.Y.1948, 79 F.Supp. 413. The same cases have held that even if the provisions of the Fair Labor Standards Act were quasi-contractual, superimposed on the contracts of the parties, nevertheless Congress had the right, in the exercise of its power to prevent injury to interstate commerce, to amend the provisions of the statute so as to give validity to contracts previously made and to extinguish rights which Congress had created by statute. In the case of Battaglia v. General Motors Corp., 2 Cir., 1948, 169 F.2d 254, 259, certiorari denied 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425, which involved the constitutionality of Section 9 of the Portal-to-Portal Act, the opinion of Judge Chase sets forth principles and doctrines which completely dispose of the arguments of plaintiffs in the case at bar with respect

to the constitutionality of Public Laws 177 and 393. The decisions upon which plaintiffs now rely were specifically considered by the Second Circuit and were distinguished in relation to the Portal-to-Portal Act of 1947. The Court, after holding that if the rights of employees under the Fair Labor Standards Act were statutory it was clear that they could be abrogated by a subsequent Act of Congress such as the Portal-to-Portal Act of 1947, considered the validity of the Act if the rights of employees were deemed to be contractual from the time of the enactment of the Fair Labor Standards Act, or from the time of the Supreme Court decision construing that Act. As to these last assumptions, the Second Circuit held: "The Portal-to-Portal Act, like the Fair Labor Standards Act, was passed as an exercise of the power to regulate commerce from time to time as conditions may require. The Congressional findings, made after investigations which disclosed amply supporting facts, show fully why the enactment of the Portal-to-Portal Act was necessary to avoid great injury to interstate commerce. In the Act Congress saw fit to change the Fair Labor Standards Act, which might be said previously to * * * include the right to compensation for portal to portal activities, by doing away with so much of those contracts in that respect as that statute had added to them. This did not deprive the appellants of any Constitutional Right. If the contractual arrangements of these private parties were subject to the Fair Labor Standards Act as it might be interpreted by the courts, or were modified to take into consideration decisions construing that statute, they were also subject to changes made in it by Congress in the exercise of its power to regulate commerce."

See also, Atallah v. B. H. Hubbert & Son, 4 Cir., 1948, 168 F.2d 993, certiorari denied Cingrigrami v. B. H. Hubbert & Son, 335 U.S. 868, 69 S.Ct. 138, 93 L.Ed. 412 and Darr v. Mutual Life Insurance Co., D.C., 78 F.Supp. 28, affirmed 2 Cir.,

25. "No person shall be * * * deprived of * * * property, without due process of law; * * *."

1948, 169 F.2d 262, certiorari denied 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415.

The plaintiffs also contend that each of Public Laws 177 and 393 is unconstitutional "if applied to deprive counsel of reasonable fees for services performed and monies expended in reliance upon preexisting law" and "should not be so applied if by avoiding such construction its validity will remain unaffected".

The services rendered by counsel were substantial and of a very high caliber. Counsel for plaintiffs expended between $7,500 and $10,000 in disbursements. Testimony was adduced at the trial, in November, 1949, to show that counsel for plaintiffs had been engaged in this litigation for five years and had worked about 8,000 hours in the preparation and prosecution of plaintiffs' claims. The claims had been tried and argued in the District Court and were argued in the Court of Appeals and the Supreme Court. However, at this point the claims did not ripen into final judgment because the cases were remanded for further trial by the District Court, especially to consider other issues as defenses to the claims. The language the Supreme Court used on the remand clearly shows that the plaintiffs did not have their claims reduced to judgment at that time.[26]

The trial on the remand was a lengthy one, covering some 2,000 pages of typewritten minutes and about 350 exhibits.

Counsel undoubtedly rendered their services, relying upon the provisions of Section 16(b) of the Fair Labor Standards Act of 1938 which provided: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Assuming counsel would have been successful in establishing the plaintiffs' right to a judgment, except for the operation of Public Laws 177 and 393, the constitutional validity of those Laws cannot be attacked on the grounds that they deprived counsel of a vested right. The right of plaintiff's counsel to fees payable by the defendants was clearly not contractual, but was created and existed solely in the statute. While the hardship is apparent, that does not render the law unconstitutional. In Darr v. Mutual Life Insurance Co., 2 Cir., 1948, 169 F.2d 262, 266 the Court, referring to Battaglia v. General Motors Corp., supra, stated: "We there discussed the constitutionality of the statute with especial reference to the then applicable section 2, and held that it was valid notwithstanding the fact that it obliterated causes of action for overtime pay, liquidated damages, and *counsel fees*, which had accrued under the Fair Labor Standards Act previous to enactment of the Portal-to-Portal Act."

In Curtis v. McWilliams, 191 Misc. 1022, 78 N.Y.S.2d 317, 335,[27] the Court after considering the constitutionality of Section 11 of the Portal-to-Portal Act, said: "What I have said as to the 'double payment' (liquidated damages) applies at least with equal force to the allowance for attorney's fees. It may be an arbitrary rule of the common law, but it is a rule, nevertheless, that the expense of carrying on a lawsuit is not an item of compensation to the prevailing party (citing cases). Attorney's fees may be allowed by statute, but while not rare, its allowance is not usual * * * and the power to deny interest or damages by way of interest from a recovery includes the power to deny attorney's fees as an item of recovery, even

26. "The Circuit Court ordered the case remanded to the District Court for determination of the amounts due respondents in accordance with its opinion. By a further order, it allowed the District Court to consider any matters presented to it by petitioners as a defense in whole or in part under the Portal to Portal Act. We modify these orders so as to permit the District Court to allow any amendments to the complaint or answer or any further evidence that the District Court may consider just." [334 U.S. 446, 68 S.Ct. 1203.]

27. The plaintiffs did not appeal from the court's holding in relation to Section 11. On appeal from the holding that Section 9 was unconstitutional, the Appellate Term reversed on the authority of Darr v. Mutual Life Ins. Co., 2 Cir., 1948, 169 F.2d 262, French v. McWilliams Dredging Co., 195 Misc. 90, 88 N.Y.S.2d 838.

retroactively. Cf. Yeiser v. Dysart, 267 U. S. 540, 541, 45 S.Ct. 399, 69 L.Ed. 775; Calhoun v. Massie, 253 U.S. 170, 40 S.Ct. 474, 64 L.Ed. 843."

The contention that Public Laws 177 and 393 are unconstitutional because they would deprive plaintiffs' counsel of fees payable by defendants is rejected for the reasons hereinabove stated.

### De Minimis Non Curat Lex

Concerning the claims of some plaintiffs, based upon the failure to pay full overtime for weeks in which they received a cargo differential or a skill differential,[28] defendants argue that the amount involved "is so trifling and so disproportionate to the cost and efforts of its determination as to require judgment for the defendants under the *de minimis doctrine*".

The attorneys for the respective parties have submitted to the Court in their briefs and letters certain computations of liability based upon the failure to pay proper overtime in weeks in which either cargo or skill differentials or both are involved.

The computations seem to have been made upon two assumptions: that Section 9 of the Portal-to-Portal Act of 1947 is not applicable to claims involving either cargo or skill differentials or both; and that no part of the contract overtime premium for either the cargo or skill differentials could be deducted in the computation of regular rate or credited to overtime found due. I have concluded on the facts as found in this case, that there can be no recovery for claims based upon the failure to pay the correct amount of overtime in weeks involving cargo differentials only, because Section 9 of the Portal-to-Portal Act of 1947 bars those claims. The elimination of weeks in which the claims involve only cargo differentials, but not skill differentials, will materially reduce the claims of some of the plaintiffs.

In the case of twelve of the thirteen test plaintiffs of Huron there was a total of one hundred and seventy-seven weeks in which cargo or skill differentials or both were involved. During the same period only fifty-eight of those weeks involved skill differentials; and only five of the thirteen test Huron plaintiffs were employed at skill differential rates. In the Bay Ridge Company case only five of the ten test plaintiffs were employed at skill differential rates and the number of weeks involving skill differentials was only sixteen.

A second factor, which also operates to further reduce the claims of plaintiffs (based upon the failure to pay full time and one-half the skill differential) is that for each of the hours set forth in Finding of Fact No. 250 the plaintiffs received pay at the contract overtime rate plus a skill differential, which totaled slightly less than time and one-half the straight time rate plus $1\frac{1}{2}$ times the skill differential. Some of those hours were hours worked after eight in a day or forty in a week. The full amount paid for those hours has been included in the computation of the regular rate; but I have held that where an employee had already worked eight hours in a day during the contract straight time period it may reasonably be inferred that any premium paid for excess hours worked in that day was paid because of work previously done in that day; and that where an employee had already worked forty hours in a week, it may reasonably be inferred that the premium paid for excess hours worked that week was paid because of hours previously worked in that week, and that such premiums constitute true overtime within the Supreme Court's ruling in this case. As true overtime, these premiums may be deducted in the computation of the regular rate and may also be credited toward any liability for overtime.

The payment of time and a half the skill differential, where overtime hours were worked, would not have imposed on defendants the burden of keeping additional daily time records. It was not a claim for a few minutes of overtime work, which

---

28. Section 9 of the Portal-to-Portal Act of 1947 has been held, supra, a complete defense to the claims involving cargo differential rates only. For the reasons heretofore set forth, skill differential claims are not barred by Section 9 of the Portal-to-Portal Act.

might be difficult to note and then to record on a daily time sheet for each employee. The extra half of the skill differential, which was not included in the overtime pay, was 2½¢ or 7½¢ per hour, depending on whether the employee did the work of a header or gangwayman, or that of an assistant foreman.

An examination of the pay records of the test plaintiffs (Exs. 7 and 8) and the analysis set forth in Finding of Fact No. 250 reveals a considerable spread between the lowest and the highest amounts due certain test plaintiffs having overtime claims for workweeks in which the skill differential was paid. In the Bay Bridge case the maximum is represented by the claim of the plaintiff Alston for work performed during the week of April 17th to April 23rd, 1944, in which he worked a total of eighty-one hours, all of them as a header; the first forty were worked within a clock pattern calling for a contract overtime rate of $1.92½. His regular rate was therefore $1.92½, and for the forty-one hours he worked in excess of forty he should have been compensated at time and one half that rate, or $2.88½. He was in fact compensated for the forty-one excess true overtime hours at the rate of $1.92½. The defendant's liability for the forty-one hours would be at the rate of 96¢ for each such hour or the sum of $39.44 for that week. The minimum in the Bay Ridge case appears to be represented by the claim of the plaintiff Alston for the workweek of April 10th to April 16th, 1944, in which he worked a total of forty straight time hours as a header at the rate of $1.30 per hour and ten overtime hours as a header at the rate of $1.92½ per hour. He should have been compensated at the rate of $1.95 per hour for the ten hours in excess of forty and the defendants' liability for these hours would be at the rate of 2½¢ additional per hour or the sum of 25¢ for that week.

In the Huron case the maximum is represented by the claim of the plaintiff, Topper, for work performed during the week of July 10th to July 16th, 1944, in which he worked a total of sixty-six hours, all of them as a header and all of them within a clock pattern at the contract overtime rate of $1.82½ plus a 5¢ skill differential. He should have been compensated at the rate of $2.88½ per hour for the twenty-six hours in excess of forty, i. e. he should have received an additional 96¢ per hour or an additional total sum of $24.96 for that week. Among the Huron test plaintiffs, Short's claim for the week September 24th to September 30th, 1945, appears to represent the minimum. The records show that during that week he worked a total of fifty-seven and one half hours, ten of which called for a skill differential rate. He received overtime pay of $1.92½ an hour for two of those hours in the same day in which he worked eight contract straight time hours at a straight time skill differential rate. The remaining forty-seven and one half hours were worked at general cargo rates. His regular rate averages out at $1.27 per hour. He should have been paid at the rate of $1.905 per hour for the seventeen and one half hours worked in excess of forty, or a total pay for the week of $84.13. He actually received the sum of $83.31. The defendant would be liable for an additional sum of 82 cents for that week.

The application of the "de minimis" doctrine to claims asserted under the Fair Labor Standards Act was discussed by the Supreme Court in Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515. The following is quoted from the opinion of Mr. Justice Murphy, 328 U.S. at page 692, 66 S.Ct. at page 1195: "We do not, of course, preclude the application of a de minimis rule where the minimum walking time is such as to be negligible. The workweek contemplated by § 7(a) must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substan-

tial measure of his time and effort that compensable working time is involved. The *de minimis* rule can doubtless be applied to much of the walking time involved in this case, but the precise scope of that application can be determined only after the trier of facts makes more definite findings as to the amount of walking time in issue."

In Frank v. Wilson & Co., Inc., 7 Cir., 1949, 172 F.2d 712, 716, certiorari denied 337 U.S. 918, 69 S.Ct. 1159, 93 L.Ed. 1727, the appellate court held:

"The Supreme Court tells us that activities are de minimis which involve only 'insubstantial and insignificant' periods of time. Anderson v. Mt. Clemens Pottery Co., supra, 328 U.S. at page 693, 66 S.Ct. at page 1195, 90 L.Ed. 1515. Also, 'it is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.' Anderson v. Mt. Clemens Pottery Co., supra, 328 U.S. at page 692, 66 S.Ct. at page 1195, 90 L.Ed. 1515. The de minimis rule, the court says, is 'justified by the actualities of working conditions * * * the realities of the industrial world,' and 'by the policy of the Fair Labor Standards Act.' It is thus apparent that no rigid rule can be laid down with mathematical certainty as to when the de minimis rule applies. Each situation presented must be examined in the light of what is 'substantial' and 'reasonable' in view of all the factors present. Here, not more than five minutes a day is involved. The checking in at the time clock, the receiving of instructions from supervisory personnel, the obtaining of tools from tool chests and cabinets, and the walking to the place plaintiffs were required to be are similar to the preliminary activities which were held governed by de minimis in the Mt. Clemens case.

"We have concluded that the overtime activities here in question are clearly de minimis under the doctrine of Anderson v. Mt. Clemens Pottery Co., supra, and hence are not compensable.

"Illustrative of other cases decided since the opinion in Anderson v. Mt. Clemens Pottery Co., supra, was announced, and the length of time consumed in preliminary activities or walking time, and all of which have been held to be de minimis, are: McIntyre v. Joseph E. Seagram & Sons Co., Inc., D.C., 72 F.Supp. 366 (10–20 minutes); McComb v. C. A. Swanson & Sons, D. C., 77 F.Supp. 716 (10–11 minutes); Lasater v. Hercules Powder Co., D.C., 73 F.Supp. 264 (possibly 10 minutes). To the same effect, see: Timmons v. Wagoner County Coal Co.[*]; Tully v. Joshua Hendy Corp. [79 F.Supp. 709]"

In the Mt. Clemens Pottery Co. case, 328 U.S. at page 694, 66 S.Ct. 1187, the Supreme Court remanded the case for more specific findings as to the amount of time involved and the application thereto of the "de minimis" doctrine, if applicable under the Supreme Court ruling. On the remand, Anderson v. Mt. Clemens Pottery Co., D.C. E.D.Mich.1947, 69 F.Supp. 710, 716 the District Court reviewed the decisions[29] and Wage and Hour Division Bulletins[30] relating to the application of the doctrine of "de minimis" to Section 7(a) of the Fair Labor Standards Act. All of the authorities noted dealt with the application of de minimis to amounts of time involved and not with respect to the sum of money involved. These authorities variously held 10 to 40 minutes a day as subject to the "de minimis" doctrine. In McIntyre v. Joseph E. Seagram & Sons Co., D.C.W.D.Ky., 1947, 72 F.Supp. 366, 372, 10 to 20 minutes a day was held to be within the de minimis rule during a period when the plaintiffs' average hourly earnings amounted to $1.18 per hour. The twenty minutes involved in the violation in that case when converted into terms of payment would amount to 39¢ per day and during overtime hours would amount to 58¢ per day. The em-

---

[*] No opinion for publication.

29. Walling v. Peavy-Wilson Lumber Co., D.C., 49 F.Supp. 846; Cameron v. Bendix Aviation Corp., D.C., 65 F.Supp. 510; Buelow v. Connor Lumber & Land Co.,

11 Lab.Cas. pp. 63, 220. See also Lasater v. Hercules, D.C., 73 F.Supp. 264.

30. Wage & Hour Manual, 1944–45, p. 234; 5 Wage & Hour Reporter 148; Wage & Hour Manual, 1944–45, p. 1193.

ployer's liability thus might total $1.95 per week for a forty hour week.

■ The violation of Section 7(a) of the Act, in the cases at bar, is found, not in the failure to include certain periods of preliminary and postliminary time in the working time, but in a failure to properly compute the overtime rate. This difference, however, does not affect the weight to be given to the foregoing cases. The non-compensable time had to be translated into dollars to be the subject of a money judgment. The doctrine of "de minimis non curat lex" is applicable generally to claims under the Fair Labor Standards Act. The reason behind the doctrine is to save the time of the Courts and to protect them from time consuming inconsequential claims.

■ The plaintiffs' brief cites some cases in which the amounts of recovery under the F. L. S. A. varied from .06¢ up to $87.51. In the circumstances of this case, taking into consideration the purpose of the statute, the nature of the violation, that it covers various weeks within a two year period, the fact that the claim is one asserted by a workingman for wages, the difficulty of computing the amounts due, I have concluded that the "de minimis" doctrine should be applied only if the amount recoverable in any week is less than $1.00. A dollar a week is not a trivial matter to a workingman.[31]

■ The burden is on each plaintiff to show that he has a claim and the correct amount thereof, Johnson v. Direrks Lumber & Coal Co., 8 Cir., 1942, 130 F.2d 115; Burke v. Mesta Mach. Co., D.C.1948, 79 F.Supp. 588; but a duty rests upon each defendant to have its records in such condition that a plaintiff can make his proof without any extraordinary expense. As stated in Walling v. Panther Creek Mines, Inc., 7 Cir., 1945, 148 F.2d 604, 607, "The Act places the duty of keeping accurate records squarely on the employer and the regulations prescribe this duty". In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 at page 686–687, 66 S.Ct. 1187 at page 1192, 90 L.Ed. 1515 the Supreme Court held: "An employee who brings suit under § 16(b) of the Act * * * has the burden of proving that he performed work for which he was not properly compensated. The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. Due regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment".

The defendants assert that to examine their records and select payroll data for work weeks involving pay differentials for the 403 plaintiffs whose claims have been severed, and then compute the amounts due, would greatly exceed the total amount of the recovery. Defendants' reply brief states that in the case against Bay Ridge, the statistical information from which the calculations were made to determine the amounts due the ten test plaintiffs for the year 1944, was compiled at a cost of $5,000.

Plaintiffs' attorney answers that any such figure would be outrageously high and that the defendant Bay Ridge has already compiled payroll records and data for at least half the period in suit and the task confronting Bay Ridge is not as stupendous as the defendant represents. Plaintiffs also show that if the records of Bay Ridge are so involved as to make the task difficult, it must be due to the failure of Bay Ridge to keep its payroll data (wage and hour records) in the form required by the Administrator's Regulations [Part 516.8(a)].

In Hanzely v. Hooven Letters, Inc., City Ct., 1943, 44 N.Y.S.2d 398, 401 it was held

---

31. This ruling will, however, eliminate most of the claims based upon work during straight time skill differential hours, where the subsequent overtime hours were compensated for at one and a half straight time, except the skill differential. An examination of many of the weekly pay records of the plaintiffs indicates that after the applicable deductions and credits are taken, most of the weeks wherein skill differential work was involved the liability is more than offset by the actual payments made and creditable.

182

that: "While the Fair Wage and Hour Act imposed a duty on the defendant to keep accurate records of plaintiff's employment embracing compensation earned and paid and time spent in his work (1942 Wage and Hour Manual 279) the failure to do so does not shift the burden of proof from the plaintiff to establish his right to recover herein."

■ Even though the burden of proof may not shift because of the employers'· failure to keep proper records within the meaning of Sec. 11(c) of the Fair Labor Standards Act, due regard for the admonition of the Supreme Court in the Mt. Clemens Pottery Co. case would require that the employers cooperate with the plaintiffs in assembling the required proof if defendants' records can supply it.

Plaintiffs' attorney appears to intimate, in his latest brief (filed November 1, 1950) that there may be claims of plaintiffs, arising during the period in suit, based on the failure of defendants to pay overtime on all hours worked in excess of forty, that in some instances defendants did not pay any overtime until plaintiffs had already worked forty-four or forty-six hours at straight time rates. Of course, if defendants' records show that any such practice was followed in any week, any plaintiff who was thus underpaid would have a valid claim for that week. But my understanding of the testimony is that after 1940 the defendants paid time and a half for all hours worked in excess of forty hours a week in practically all instances, although there were three instances at New Haven where employees did not receive any overtime for hours in excess of forty, unless they had worked forty-four or forty-six hours.

I believe that I have considered, in the above opinion, every substantial factual and legal issue presented by the able counsel who have tried and briefed this case. Following the procedure recommended by the United States Court of Appeals for this Circuit I am filing Findings of Fact and Conclusions of Law at the same time that this opinion is filed.

Let a decree, in accordance with the Conclusions of Law, be settled on five days' notice.